Smith, special Judge.
On the 24th January, 1784, James M’Gavock entered a pre-emption 640 acres of land, adjoining Evan Baker, assignee of Samuel Conn, on the north, beginning at Conn’s beginning, running west 320 poles, north 320 poles, &c. James M’Gavock was assign-ee of Evan Baker, assignee, &c.
On the 19th October, 1784, David Shelby, assignee of William Conn, assignee of Evan Baker, assignee of Samuel Conn, entered a pre-emption of 640 acres, lying about a mile and a half nortb-east of Nashville, joining James Shaw’s survey on the north; beginning at a large black oak and hackberry, on a dry-branch, leading to the dry-pond, running west, 320 poles, south 320 poles, &c. On the 16th January, 1784, James Shaw entered a pre-emption of 640 acres of land, lying on the north side of Cumberland river; beginning at the mouth of the French-Lick branch, extending east to a conditional line with Evan Baker, and up the river for complement.
On the 28th January, 1784, Zachariah Stull, heir of Jacob Stull, dec’d. entered a pre-emption of640 acres, on the north side of Cumberland, about two miles and a half from Nasborough, at a spring on Jasper’s old trace; beginning 300 yards below the spring, and running west, for complement, including the spring and improvements.
On the 28th February, 1808, a grant issued to James *264 M’Gavock, by virtue of a duplicate warrant for G40 acres, Ike original of which issued 24th January u1784, in the oiiice of Samuel Barton, entry taker of pre-emption claims, for a tract cif land containing 194 acres, part of said warrant, on the north side of Cumberland, beginning at two hackberries, and an elm, being a corner called for in an entry (606), oí Evan Baker, assignee of Samuel Conn, the black oak called for being dead and fallen down, running west and north. This grant covers the land in dispute, which lies in the north-west corner of a tract, beginning at the black oak, &c.; running west 320 poles, north 320 poles, east 320 poles, south 320 poles.
Defendant claims under a grant to H. Tatum, for 274 acres, issued 23d February, 1793, which covers the land in controversy, and under which he has held possession, under marked visible lines and boundaries for more than seven, indeed, upwards of thirty years before suit brought. But the actual possession of defendant upon the part covered by both grants, did not continue seven years, before suit brought. No possession was ever taken under M’Gavock’s grant.
There was given evidence, that copy of a record in a caveat cause between Stull and M’Gavock, in a contest between their respective entries in 1786. David M’Gav-ock proved, that in 1785, he, as deputy surveyor, surveyed James M’Gavock’s entry, and returned a plat, &c. to office: that he began at the black oak and hackberry, the same corner at which the grant began; that he run and marked the lines around the same, the distance and courses called for in the entry: he found the corner by direction of Gillespie, who lived on the south side of Cumberland, near the mouth of Lick branch. Gillespie had beard from Shelby how to find it: M’Gavock had no difficulty in finding it. The black oak and hackberry were marked as corners, south and west — large chips bad been taken out of the black oak, and letters, E. Baker, cut in and fitted with red paint, figures, 1783. — Saw a line marked from the corner, south. When he ■ went to survey Stull forbid him. threatened to break his chain ¿fee. from which *265 time there was much conversation about the corner in the , country.
It was proved by John Nichols, Sampson Williams and others, that this is the same corner described by John Shelby and David Shelby in their depositions; and that the same was notorious in that neighborhood, before the commencement of defendant’s claim. John Shelby proves that he was employed by Evan Baker to lay off and sur-' vey a pre-emption of 640 acres, a mile and a half or two miles from Nashville, which he did, according to the cardinal points: — this was in January 1783; — thathe marked for the beginning a large black or Spanish oak and hack-berry, standing on a dry branch, which he showed to John Nichols in 1799, — the black oak at that time, broke off, leaving a high stump. The survey was made that Baker might, more specially, describe his location.
David Shelby proves that in 1783 or 1784 he purchased a pre-emption right, granted to Evan Baker, assignee . of Samuel Conn, which he entered I9th October 1784, and was, subsequently, made void; that between the entry and making void, he saw a corner which he took to be the beginning corner of the pre-emption; that he has lately been shown, by John Nichols, a large black oak, then down, and a hackberry, on the side of a small branch: — and, he thinks the situation accords with his ideas of the situation first seen by him.
Defendant proved that James Shaw’s entry was well known in 1784, and was notorious, if not more so, than any claim in the country; and that if Shelby’s entry were surveyed to adjoin Shaw on the north, and run in a square or oblong, in any way, and survey M’Gavock’s to adjoin it — when thus surveyed, it would not include any part of the land in controversy. The dry branch is about five miles long; the small branch emptying into it, is about half a mile long. The tree, claimed as M’Gavock’s beginning,is on the small branch, about forty poles from the main dry branch. Sampson Williams and his family called the small dry branch, the Caney Hollow, in 1783-4.
Samuel Weakley was also examined; but his teslimo- *266 ny is deemed immaterial upon the question involved. — " The first question presented on the foregoing state of facts is, whether the entry of James M’Gavock is special, so as to coalesce with the grant and constitute a legal title from the date of the entry? It is sufficiently proved that in 1783, the place claimed for M’Gavock’s beginning, was marked as a beginning to Conn’s pre-emption, assigned'to E. Baker, and the said pre-emption surveyed, to enable the claimant to locate with precision; that in 1785 the entry of James M’Gavock was surveyed, beginning at the same place, and run out in a square, including the land in dispute, and that from the time of the last mentioned survey, it became, and continued to be notorious, as the beginning corner of James M’Gavock’s survey.
From these facts it seems apparent that M’Gavock’s entry was originally intended to be made at the place now claimed, so that, in point of identity, I think it is fully established. It is also apparent, that before the inception of title under which Talbot claims, the entry, claim and beginning of M’Gavock had become notorious to all persons acquainted in that immediate section of country» And no greater certainty can be required, than that an entry should call for a. specific object, generally known.
It has,however, been much insisted on by the plaintiff in error, that M’Gavock’s entry was so radically defective, when made, that no subsequent occurrence could give it validity, inasmuch as it calls to adjoin E. Baker, assignee of Samuel Conn, on the north, beginning at Conn’s beginning, at a time when there was no existing claim of Baker’s at the place designated; as the entry on Baker’s claim was made many months after the entry on M’Gavock’s. It is believed that to give validity to an entry, it is not essential that the claim which it calls to adjoin should have a legal existence, as an entry or grant; but it would be sufficient if its identity and notoriety could be established by other means. 1 Ten. Rep. 400. Upon the question of notoriety it is believed, both from authority and reason, that if it be acquired alter the first entry and before the inception of the conflicting claim, it *267 is sufficient, in Simms’ lessee vs. Dickson, Cooke’s Rep. 139, Judge Toad intimates an opinion that it would be sufficient. And in the same case 141, Judge M’Nairy explicitly states it as his opinion, that if the objects called for are notorious at the time the entry is made, or become so before any person else makes an entry, the object of the law is complied with. He asks-, what has the subsequent enterer to complain of? the object of notoriety is to give notice, and if it be acquired before the making of the subsequent entry, every purpose, for which notoriety has been deemed necessary, is answered. In the sanie book, Baird &c. vs. Trimble’s lessee, Judge Whyte, in delivering the opinion of the court, says: “it is conceived that the entry must call for objects at the place claimed, which, either at the time of making the entry, or before the inception of the conflicting claim, are so notorious as to enable any person acquainted with the land claimed to know the place intended by the enterer.” Again, in Thompson vs. Garrison, 5 Hayw. 257, Judges Roane and Whyte say: “this north east coiner is found to have been notoriously called Christmass’ corner before Thompson’s entries were made; tho’ it was not so called when Garrison’s entry was made — that called for Christmass’ north east corner, and a point 80 poles south thereof, for a beginning: we are therefore of opinion that Garrison’s entry was rendered special before that of Thompson’s was made. He cannot say that he was misled by the entry of Garrison and its uncertainty. It is good in law against Thompson’s entry.” I think these several opinions are supported by reason. — Since, what can it matter to a subsequent locator what time a conflicting claim acquired notoriety, so that it existed previous to the inception of his own title? It is believed, that the entry of M’Gavock was special and notorious so as to overreach a claim commencing when Talbot’s did; and that if part were lost by better title or otherwise, the balance could extend to and cover any land included in the original entry. So that upon these questions there was no error in the charge of the judge below, as against plaintiff in error.
*268 But the question, the consideration of which involves most difficulty, and upon which I have met with least assistance from authority, is that, raised upon the construetion of the statute of limitations, of 1797, ch. 43, sec, 4. The case presents the following facts: the plaintiff in ejectment, having the elder and better title to the land in dispute, is not in the actual possession or occupation of any part of the land, included in his grant. The defendant, Talbot having a younger and inferior title, which, in part, interferes with. M’Gavock’s claim so as to cover the land in dispute,hasbeen in the actual possession and occupation oí that part of the land, not covered by both grants, for more than seven years, before bringing this suit; but has not been in possession of the part covered by both grants, until within seven years before bringing this suit — does the statute in such case operate a bar? It is in these words: “whereas doubts have arisen with respect to the true construction of the present existing laws, respecting seven years’ peaceable possession. Be it enacted, that in all cases, where any person or persons shall have had seven years’ peaceable possession of any land by virtue of a grant, or deed of conveyance founded upon a grant, and no legal claim by suit in law, by such, set up to said land, within the above said term; that then and in that case the person or persons so holding possession as aforesaid, shall be entitled to hold possession, in- preference to all other claimants, of such quantity of land as shall be specified, in his, her or their grant, or deed of conveyance founded on a grant as aforesaid. And any person or persons, who shall neglect for the said term of seven years, from the time of such peaceable possession having been obtained, to avail themseves of the benefit of any title or legal claim, which he, she, or they have to any lands within this state, shall, and is hereby declared to be, forever barred.” .
It is observable that the statute is not professedly in-troductive of any new law on the subject, but-seems rather designed as an exposition of the old law, and for the removal of doubts which existed as to its interpretation.. *269 Those doubts, probably, were, whether a possession without color of title, could avail the possessor; and whether it should be confined* to the spot actually occupied; or should be co-extensive with his claim; as these are the questions in relation to which provision is made in the act. The intention of the act was, to render valid by seven years’ possession, titles to land, which, otherwise, would have been invalid. It was, obviously designed to operate upon the possession of one who had not the best title to the land possessed; for it would be wholly useless to say, that the possession of the true owner should give him title. I think, therefore, the act does not refer to any possession but one of disputed land, as it refers to a possession for which suit may be brought, of land, the title to which requires the sanction of seven years’ possession to perfect it. The view, here taken, of the question is corroborated by the opinion of Judge Overton, 1 Ten. Rep.453, where he says: “possession of land, so as to produce a bar, must be an actual possession of some part in dispute. Cultivation of part of the defendants’ claim, not within the bounds of the disputed part, is not sufficient to authorize the bar of the statute.” Altho’ it may be said that this was an opinion hastily delivered in a charge to a jury, and, therefore, not entitled to the same consideration that an opinion formed upon deliberation under other circumstances would command: — I apprehend it would, at any time be difficult to find that Judge unprepared to' give an opinion, deliberately formed, upon all important questions involved in consideration of land titles. To the same effect may be- cited, 4 Bibb 257, Trimble vs. Smith &c. and 1 Marshall 207, Smith vs. Mitchell, where the questions are similar and where it is decided: “that the actual occupancy,by a junior patentee of that part of a tract of land which does not interfere with the elder grant, does not give him possession of the part within the interference, altho’ the elder patentee never actually entered upon any part of the land included in his patent. In the case in Bibb, the court says: “to construe an entry into part to which he has right, to give *270 him possession of another part to which he has no right, would be making an act which was right in itself, tortuous by construction. This would be wholly unwarranted by any precedent, and in direct violation of the principle of law which requires, that where .an act iS’done which is susceptible of a two fold construction, one of which is consistent with law, and the other not, that the former should prevail.” And, altho’ it may be said that these decisions are, or may be founded on statutes couched .in different terms from ours, I consider ours as introducing no new principle upon the question of possession: and, consequently, that the reasons, influencing these cases, are equally effective here. I am of opinion, therefore, that the possession of Thomas Talbot is not such as to give title to hold possession of the land in controversy, as against James M’Gavock’s title; and that there was no error in the charge of the court below in relation to the statute of limitations, or in refusing a new trial. And I am of opinion that the judgment of the circuit court be affirmed.
Catron, Judge.
Is the foregoing entry special for the land granted ? If so, the grant and entry constitute one legal title, vested from the date of the entry. Anderson vs. Conner, Cook’s Rep. 311, 12. To locate the grant,nothing is necessary but proof of identity; or, in other words, parol or other proof, extrinsic of the grant, ascertaining the. boundary of the land granted. Similar proof must also be made to fix the entry to the spot entered ; but to sustain the entry as forming part of the legal title, specialty in its locative calls is necessary, bjr which our statutes have been construed to mean, such description of some known object, as will direct subsequent locators, where- the land lies, that they may not conflict therewith. This, has, perhaps, been, a little unaptly, called notoriety of entry. No such term is used in the statutes of North Carolina, or Tennessee. The statutes require that the notorious, natural objects in the neighborhood shall be called for, but the courts have uniformly *271 holden, that where other lands are called for, which are special in their calls, it will fix the younger entry, tho’ vague, save in the call for adjoining said lands. 2 Tenn. Rep. 287-8. It is also a rule that an artificial object may be called for, as a line or corner oí another tract, which, when the entry was made, was of little note, and could give no information to others then wishing to locate; but, which, subsequently,became perfectly well known to all acquainted in that section of the country. If, after the object to which the first entry referred itself, became thus notorious, another entry was made to conflict with it, the latter has always been adjudged to give way to the former, as a special entry. 1 Ten. Rep. 359, 377. 2 Ten. Rep. 222-3. Cooke’s Rep. 355-6. do 18, 138. 5 Hay. 257.
James M’Gavock’s entry was made 24th January 1784, for 640 acres “adjoining Evan Baker, assignee of Samuel Conn, on the north: beginning at Samuel Conn’s begin ning, and running west 320 poles, north 320 poles, east 320 poles, and south to the beginning. This call to adjoin Even Baker, is prima facia good upon its face, because we will presume the entry referred to, made in compliance with the laws of the country. Waller vs. Campbell, 2 Ten. Rep. 320, then the entry referred to will determine the specialty. Here the difficulty arises. In truth, Evan Baker, as assignee of Conn, had a pre-emption claim or Conn right, which John Shelby surveyed for him in 1783, making the beginning which is called for in M’Gavock’s entry and running out the 640 acres. This was done to enable Baker, more precisely, to describe the land to the commissioners, so that they might truly describe it in the certificate, but no entry had yet been made. Afterwards, Evan Baker assigned his pre-emption to David Shelby: — on the 19th of October 1784, David Shelby entered the pre-emption of E. Baker, as assignee of Samuel Conn,lying about a mile and a half east of Nashville, joining James Shaw’s survey, on the north: beginning at a large black oak and haclcberry, on a dry branch, leading to the dry pond; running west 320 poles, south 320 poles &c.
*272 James Shaw’s pre-emption of 640 acres calls to be “on the north side of Cumberland river, beginning at the mouth of the French lick branch, extending east, to a conditional line, between himself and E. Baker, and up the river for complement.”
That Baker’s pre-emption and beginning corner were well known when James M’Gavock’s entry was made, is abundantly proved: still, there was no record evidence with which M’Gavock could furnish the surveyor, by which his entry could be found; nor could others,by such evidence, ascertain its locality. After Shelby made Baker’s entry, however, no location could be more certain than M’Gavock’s, from the record proof alone. In 1793, there issued a grant to H. Tatum for 274 acres, under which Talbot claims, interfering with the northern side of M’Gavock’s entry. M’Gavock’s grant did not issue until about the year 1808, when it was also surveyed. Tatum’s grant seems to have been founded upon a removed warrant, as it recites no entry, nor is any produced.
To ascertain whether M’Gavock’s entry can be connected with his grant, a slight examination of the doctrine of notoriety will be made. That this doctrine is now too well settled tobe disturbed, I will admit; but that it is required by the statutes of North Carolina, no well informed land lawyer will contend. It had its origin in usage and convenience, as will be seen by the foregoing authorities. Judge Overton has examined the law's of North Carolina on the subject of entering and surveying lands with an astuteness and ability, that cannot be otherwise than convincing to any man who will read his decisions. This is a branch of our land law growing out of adjudication, not the legislation of North Carolina.— Even so late as 1823, in the cause of Rogers vs. Benton and others, Peck’s Rep. 108, two of the judges of this court deemed it a spurious scion, unwarrantably engraft-ed upon our land law, that should be cut off. The other two judges thought differently, and the opinion of the circuit judge prevailed. As the doctrine had for its object, the giving notice to the younger enterer what lands were *273 appropriated by previous entry, it has, in its practical application, been applied according to the usage ofthe country and the mode 01 doing business, and is not governed by technical rules. The country in its early settlement, was continually disturbed with Indian hostilities, and it was almost impossible that the oldest entry should always be first surveyed, altho’ the laws of North Carolina expressly required this to be done: therefore, the plain sense of the community adopted it as a measure of justice, which presently assumed the force of law, that the entry should give the notice which the statutes required the surveys to do. But when the object refeired to in the entry becarge notorious was not material, so that it happened before the younger location was made; — it these facts existed, to point out the locality of the entry, and they could be ascertained by reasonable diligence and skill, it could not concern the younger enterer how the matter stood when the location was first made.
Let us apply these rules to the present controversy. From the 24th of January 1784, when M’Gavock’s entry' was made, to the 19th of October 1784, when Shelby’s was made, M’Gavock’s was not a special entry that could have postponed the grant to Tatum. But how was it after Shelby’s entry was recorded? It could just as certainly have been found as the mouth of the Lick branch or the French lick itself. Shaw began opposite the mouth of the branch. Baker’s pre-emption hounded upon Shaw’s and M’Gavock’s on Baker’s. These two beginning at the same corner which was plainly marked.
In 1793, when Tatum’s grant issued, M’Gavock’s entry had become very notorious, because of a controversy by caveat between Stull and James M’Gavock. Hence, there is no error in the charge of the circuit judge upon this point.
It is next objected that the entry is not correctly surveyed, and,therefore, cannot be connected with the grant. The facts are these: Zachariah Stull located his pre-emption in an oblong, east and west, directly north of M’Ga-veck’f! southern boundary, placing his southern boundary, *274 only 18 poles north of M’Gavock’s: hence, Stall’s tract (219 poles wide) lay over M’Gavock’s entry, leaving a piece of 67 poles wide on the north side, and one 18 poles wide on the south. Stull’s entry upon the preemption books is younger than M’Gavock’s; still, here-covered against the latter upon a caveat, no doubt, because he had the oldest pre-emption, leaving M’Gavock only 194 acres, for which quantity - his grant issued. It is contended, that as the grant is only for 194 acres, this should have been run out in a square or oblong from the beginning, when it could not have reached Tatum’s grant.
The State of North Carolina agreed with the enterer, that when he paid his money and made his location for any particular spot of land, he should have vested in him an equitable title against the state, and all subsequently purchasing from her, for the land purchased, and that she would grant the land thus entered to him. Therefore, M’Gavock had a vested right to all the land entered, to which the state had title when the location was made. Stull had a previous vested right to part of the land of which he could not be deprived — for so much, M’Ga-vock’s entry was void; but by what rule of justice could the state refuse to grant to M’Gavock that portion of his entry she had the right to grant to him? none. It is insisted, that for as much as M’G-avock appropriated his warrant elsewhere, except for the 194 acres, the entry can only stand as it was originally made for this quantity. The land law of 1807, sec. 43, authorised M’Ga-vock to obtain other land for the quantity interfered with, which might be located and granted elsewhere. How and when was the fact of interference ascertained? By the survey of M’Gavock’s entry for the purpose of obtaining a grant thereon. The facts were 'shown by the surveyor on the face of the plat, and stated by the certificate of survey; this, when returned to the proper office, authorized M’Gavock to obtain a grant for the 194-acres, upon his entry of 1784, and to make a new entry for 446 acres on other vacant land; and these acts were grounded upon a survey made pursuant tc the call of the *275 entry. There was no legal mode of surveying M’Ga-vock's entry, but according to its calls. Truly, the surveyor was not authorized to lay off, for M’Gavock, lands, previously appropriated, nor did he do so. It did-not follow that he laid off Stull’s land to M’Gavock because the northern lines of his plat extended across it. To ascertain M’Gavock’s boundary and the extent of interference, this was necessary and proper. TheVharge of the circuit court was clearly right upon this point.
The next question presented is, was M’Gavock bound by the statute of limitations? Talbot had been in possession of the undisputed part of Tatum’s grant, by virtue of a regular legal title to the whole land, granted for many years, say twenty, before M’Gavock’s suit was brought, but less than seven years, within the disputed part. M’Gavock had never been in possession of any part of his grant.
It is contended that the possession of Talbot of any part of the land, extended to the whole bounds of the grant, and gave him a good title by the act of 1797, ch. 43, sec. 4; that to prevent the operation of the statute M’Gavock must have entered. Suppose M’Gavock had entered into some part of his grant, not claimed by Talbot; would this have prevented the bar? Certainly not, for two reasons. 1st. The statute having commenced its operation would have run on, until Talbot was disturbed in his possession, which extended no further than the bounds of the grant of Tatum, where he would have remained undisturbed. 2d. Because the statute declares a suit the only mean of asserting the better title. Entries, to vest or divest title, or to prevent the formation of a bar by the statute, never entered into the consideration of the legislature when passing the act of 1797, nor did they legislate for the protection of those who occupied and had improved lands undisputed. The sole object of the act was to declare the rights of those who had actual possession of lands, to which different persons claimed title; or, in the popular phrase, to protect the peaceable possessor for seven years of “disputed lands?' To such and such only, the act refers.
*276 Let us take this case as an instance to prove the position. Tatum’s grant was good, and vested the title to M’Gavock’s line; but for the land south of this it was void against the special entry, by the words of the statutes of North Carolina (Cooke’s Rep. 32.) Talbot’s possession was rightful to the extent Tatum’s grant communicated title: to this rightful possession the act of 1797 did not extend — its object and policy was, to give a good title to the tortuous possession of land to which he had no title when he entered. Into such part Talbot never did enter and possess himself for seven years, consequently, the act affords him no protection to the land south of M’-Gavock’s line.
If the legislature meant differently, a party, having right, might be ousted thereof, without any wrong being in fact done to him, or a possibility of knowledge on his part, that any was intended. Were it true that possession of the undisputed part, extended to the disputed part also, A might make a deed to B for the whole Western District of Tennos'see; the latter take possession of a part passed by the deed, continue seven years, and then claim every tract within its bounds, not actually possessed by the true owner. So, north and east of the Congressional reservation line, grants of land, previously granted, have been, and will, no doubt, be obtained, with the express view of defeating the better title, by seven years’ adverse possession. A grant for five thousand acres at this time will not cost five dollars. Say the new grantee takes possession of part covered by his grant and settles a few miles from his neighbor’s land, his possession or occupancy not extending over the line of the latter, and thus'defeats his title by adverse possession: would not this violate the plain sense of an agricultural community, as well as the intention of the framers of the acts of 1797 and 18191
Confine the statute to the object of legislation, and no' such absurdity can present itself. The land in controversy in ejectment, is the only parcel looked to: if the defendant is not in possession of this, the plaintiff cannot. *277 'recover against him. The intention of the act of 1797, ® _ , 1 ii-was to protect the possessor, subject to be sued during the whole seven years. If the defendant is not subject to be sued, his possession is not adverse. This is the test of adverse possession.
In June 1809, in Napier vs. Simpson,! Ten. Rep. 153, the superior court instructed the jury, “that possession of land so as.to produce a bar, must be an actual possession of some part in dispute; cultivation on part of the defendant’s claim, not within the bounds of the disputed part, is not sufficient to authorize the bar of the statute.”
I understand the bench, the bar, the legislature and the community at large, have acquiesced in this decision, as the law for twenty years, not with dis-satisfaction, but with a settled conviction, that it is according to the true sense and meaning of the act of 1797, and I believe with all possible deference to the opinion of others, it should not now be disturbed, independent of any doubts that might he entertained of its correctness. I therefore, think there was no error in this part of the charge of the circuit judge.
The verdict in this case is, that defendant is guilty for all the land within plaintiff’s grant, and north of Stull’s grant in the declaration mentioned.
The judgment of the circuit court is that the plaintiff recover against defendant his term to come, in the messu- ■ age, lands and appurtenances, in the declaration mention-tioned.
In the declaration Stull’s northern boundary forms one line of M’Gavock’s land declared for. It is distinctly shown by the declaration, itself, how M’Gavock’s land lies in reference to the locality of Stull’s, and how much land lies north, west and south of it, and within M’Ga-vock’s declaration described. By referring to the declaration, the special verdict is certain. If Talbot had possession of the lands declared for, west of the grant of Stull, he is not guilty of a trespass for that, or subject to be dispossessed.
The judgment must pursue the verdict. Adams on *278 Eject. 291, else plaintiff might recover from defendant a rightful possession to a part of the land. Thejudgment in this canse must be entered, that plaintiff recover all that part of the lands &c. in the declaration mentioned, lying north of Stull’s land: and as to the other parts of the land declared for, that the plaintiff be in mercy, and that the defendant go thereof, without daj% Adams’ Eject. 298.
This court, proceeding to give such judgment as the circuit court ought to have given upon this verdict, reverse the judgment below, and direct it to he entered as above indicated, at the cost of defendant in error, as to this court.
Whyte, Judge.
I deem it unnecessary to examine any of the questions made on the argument, except the one made on the statute of limitations. Whether the title of the lessor of the plaintiff is the oldest; whether the survey has been regularly made; and whether, in other respects, the statute of limitations aside, it is better than that of the defendant, is, in my view, quite immaterial.-— The act of 1797, puts the issue of the cause entirely upon the defendant’s case, disregarding the plaintiff’s title, unless he is an infant, or comes within one of the exceptions in the statute, which prevents the application of the defendant’s case to the land in controversy. What is the defendant’s case on the record? It is this: he has been seated down upon, and living on the land upwards of seven years, in peaceable possesion, under deeds, founded upon grants, which include and cover the disputed land; and no legal claim, by suil, in law, sot up, to the same, during the said term of seven years.
For the plaintiff it is argued that the defendant Talbot has not been in a possession of the disputed land, which is included in and covered by the plaintiff’s grants, as well as the defendant’s grant; or in other words, of the interference which is indicated by inclosure, cultivation or other agricultural improvement, such only being indubitable evidence of an adverso possession; such as where matured *279 by time, would toll the plaintiff’s entry and give protec-lion to the defendant’s, having only a possession, shown and designated by the bounds, or, on courses and distances, of his deeds and grants: which last possession of the interference by deeds and grants alone, does not constitute such a possession, in law, of the interference, as protects the defendant under the statute against the elder grant of the plaintiff, M’Gavock, and for this are cited the cases of Trimble vs. Smith, 4 Bibb 257, and Smith vs. Mitchell, 1 Mar. 207. One passing remark only, will be made on these cases, that they cannot be taken as authority in the present case, or received as precedents of the law to direct the judgment to be now rendered by this court. These cases, as was observed by the counsel, agree with the one before this court, in the sameness of the facts. In them, as in the present, the contest is between a junior and elder patentee, whose grants, in part, interfere and cover the same spot of land. The junior patentee is, and has been settled upon that part of the land included within his patent, which is not within the interference for a length of time sufficient to toll the right of entry, of the senior patentee. The senior grantee has never been in possession of any part of the land, covered by his patent. Thus far,' the cases cited agree with the present-case, but they disagree in respect of the rules applicable to their decision. The former are or profess to be decided by the rules of the common law; but the latter is to be decided under our act of assembly of 1797, ch. 43, sec. 4, in which the statute or act of assembly controuls the rules of the common law.
The act of 1797, ch. 43, sec. 4, is in these words: uBeit enacted, That in all cases, where any person or persons shall have had seven years’ peaceable possession of any land, by virtue of a grant or deed of conveyance founded upon a grant, and no legal claim by suit, in law, by such set up to said land, within the above said term, that then and in that case, the person or persons so holding possession as aforesaid shall be entitled to hold possession in preference to all other claimants, such quantity of land as *280 shall be specified in his, her or their said grant, deed of conveyance iounded on a grant, as aforesaid, and any per-* son or persons, who shall neglect for the said term of sev-cn years, from the time of such peaceable possession having been obtained, to avail themselves of the benefit of any title or legal claim which he, she, or they have to any lands within this state, shall, and is hereby declared to be forever barred; Provided, nothing contained in this act shall, in any manner, tend to affect or injure the rights of minors, feme coverts, idiots or lunatics, any law, usage or custom to the contrary notwithstanding,”
The most prominent feature of this act is, that it regards the defendant’s cause alone. It lays down the case which shall be protected against the adverse claim of the plaintiff and operates a bar to that claim be it what it, may. The expression of the statute is most comprehensive: “to hold possession in preference to all claimants,” including every diversity and variety of right, however evidenced by title that may be brought forward against it. The statute was made for the benefit of defendants who had seated themselves down, on land under a title by grant, or deed of conveyance, founded on a grant; and who, believing they had good right at the time, and also, having had afterwards, peaceable possession for seven years without legal claim, by suit in law, they should not be disturbed by a legal claim, which, if it had been asserted in time might have proved superior to that under which the defendant’s possession was taken; or be evicted therefrom, after such evidence’’ oí ownership, and acquiescence therein by the plaintiff.
The statute says, “that then and in that case, the person or persons so holding possession as aforesaid, shall be entitled to hold possession” — of what? it may be asked. The answer in the words of the statute is, of “such quantity of land as shall be specified in his, her or their grant, or deed of conveyance, founded on a grant.” Here the statute describes and determines the possession on which it operates; what it is, where found, and how ascertained. It is unnecessary then, in following the plaintiff’s ar- *281 gumcnl to discuss tlie question of adverse possession, either as it regards the plaintiff or the defendant, or what constitutes it, or what does not; whether a possession fence, so called in Jackson vs. Shoemaker, made by trees felled, and lapping, one upon another, or a real and substantial inclosure; or, to examine the quo ammo, with which it was first taken, by evidence aliunde to the'grant or deed, and possession under it, cither by express proof or by circumstances: — I say, this decision is unnecessary as respects either the plaintiff or defendant — as respects the plaintiff; for, let his title be what it may, and his possession as adverse as he may wish, it matters not, for the question is, not on the title and possession of the plaintiff, anterior to that of the defendant, but on that of the defendant.
As regards the defendant’s adverse possession, and the distinctions therein taken in the books, it is out of the case; for the act, itself, settles the possession and the title under which he must hold, without reference to any ' such distinctions.
Thus we see the statute of 1.797, gives a very different view of the defendant’s possession, from that given by the plaintiff. The statute does not point to the defendant’s curtilage, cornfield, or pasture ground, for a description of his possession, hut to his grant or deed; — nor, for the extent of his possession, to his fences or ditches, to his dykes or his hedges; but to the bounds of his grant or deed, the outline of which grant or deed is made one and the same with that of his possession. This is the statute possession, and this is its extent, given to the defendant, under the act of 1797, ch. 43, sec. 4 — who has seated himself down on land under a grant or deed of conveyance, founded on a grant, and hath there remained, peaceably possessed, without legal claim, by suit in law, for the space of seven years. Opposed to this, 1 Ten. Rep. 453 is cited, being part of a charge to the jury, by Judge Over-ton, sitting alone, in the old superior court, the other two Judges not sitting. lli:.a¡ follows: "'Possession of land to produce :» bar, ¡bu-;í be an -utual poriesr-io»1 >:l *282 some part in dispute. Cultivation of part of the defen dant’s claim,not within the bounds of the disputed part, is not sufficient to authorize the lar of the statute.” 1 have the highest respect for the decisions of this learned Judge; but when an opportunity is not had for consideration, as is the case,frequently, upon points presented on jury trials, when an opinion must be given on the spur of the occasion, and, sometimes, on more questions than one, as was the Case on the trial referred to — it must be admitted, the circumstances are unfavorable to its authority.
In the same charge it is also laid down, that the act of 1797, ch. 43, sec. 4, is couched in doubtful language, is an explanatory act, and was intended to remove a doubt ■whichhad arisen upon the act of 1715 ch. 27 — which doubt was — whether a seven years’ naked possession without a title, would bar a claim. Now, altlio’ there are numerous cases upon the construction of this act of 1715, ch. 27, to be found in the North Carolina reports, not one is cited in support of this position relative to a naked possession, but a fair inference to the contrary is to be drawn from the case of Andrews vs. Mulford, 1 Hayw. N. C. Rep. 311. In this case we have an able judicial construction of the act of 1715, ch. 27, to be found in pages 319 — 20 of the report, which, tho’ very important and applicable, yet, from its length, cannot be transcribed. 1 must, therefore, be contented with the reference made, and the following small part of it inserted here. In order (say the court) “to gain a title by possession under this act, these circumstances must concur: he must be possessed of land which has been actually granted — a possession of vacant lands will not do, unless attended with such circumstances as required by the late act of assembly for limiting the claim of the state — he must take possession with a belief that the land possessed is his own, as under a patent, or deed under some patentee: — ■ he must take possession under such circumstances as are capable in their nature of notifying to mankind, that he is upon thfe land, claiming it as his own, as in person, or by *283 tenant — this notorious possession must be a continued possession” &c. &c. This is the language of the judiciary of N. Carolina in 1796, the year before the act in question was passed. It shows that whatever may have been the doubts entertained before that time, if any, they were settled by that decision, of which a naked possession is not one — it is not mentioned or even hinted at, which, if it ever had existed, was lost sight of before the passage of 1797, as this'case proves, no room being by that decision left for raising such a question to be met by a provision of the act of 1797.
As for this act of 1797, ch. 43, sec. 4, being couched in doubtful language, I had always considered that its import could not be misunderstood — its decision is plain, its meaning clear, and its object apparent, throughout;— an honest appropriation and settlement of the country.
Upon the first settlement of the parent state of North Carolina, an act was passed by it, (the act of 1715,) having the same subject in view as this act of 1797; of this the similarity in situation of both states, at the respective times of making these acts, produced similarity of purpose, (to wit) — holding out inducements to settlers by protecting their settlement. Length of time and judicial decision under the first act, had discovered its defect, and suggested its remedy. The defect was, the want of explicitness in the specification of the land, upon which the defendant’s possession should attach under the statute of limitations, and the title under which it was held. This defect had caused much controversy about land, rendering tenants, or the holders of them, uneasy and doubtful as to the issue of claims against their rights and possessions, which the makers of the act of 1797, ch. 43, in furtherance of the object intended, (to wit) — the fair and honest settlement of the country, by the 4th sec. guarded against and removed by an explicit and precise declaration of the quantum or extent of possession, the defendant under it should hold, and of the title, (to wit) — such quantity of land as shall be specified in his grant, or deed, of conveyance founded on a grant.
*284 Whatever land is specified in the grant, or deed, h; that, which is comprehended in it and covered by it; this land, so covered and bounded by the grant, is the possession of the defendant. No words can add to the clearness of the meaning of the statute in this respect. The view taken by the plaintiff’s argument, that possession under the act requires an adverse possession of the interference by cultivation or other agricultural improvements is wholly inadmissible, as well from the object of the act, as from its letter. If possession under the act required a cultivation of a part of the interference, what would become of the defendant in the case, where the whole of his wood land, or uncultivated land, was covered by the interference, after a sevens, or a twenty years’ possession of his cleared land? He could not live; the fund to which he looked for the support of his family, to procure them the comforts, conveniences, perhaps the necessaries of life, would be swept away from him. It is the unimproved land that is the fund for supplying his fuel, fencing, building, plantation implements, and repairs. Of what value in this country would open land be without timbered land to the possessor? he could not live upon it. A situation like this would not enter into the mind of the legislature:: and yet, every interference, on this construction of the plaintiff, approaches such situation, pro tanto — diminishing, and according to its degree of approximation thereto, in part, or in whole, defeating the fair expectations of the settler, that after a seven years’ toil, the statute of 1797, would complete his security, in the fruits of his honest labor, against all the world.
These are some of the reasons for believing that the act of 1797 means, precisely, what its words express, and, as there is no ambiguity in the expression, the sound rule of construction is the letter, an adherence to which is always safe, unless productive of an absurdity: whereas, a departure is, in general, dangerous, creating anomalies deviating from the intention of the law makers.— These positions are supported by the highest authority.. Ree 4 Wheat,&c, where chief justice Marshall, in *285 delivering the opinion of the court, says: “But if, in any case, the plain meaning of a provision, not contradicted by any other provision in the same instrument, is to bo disregarded, because we believe the framers of that instrument could not intend what they say, it must be one in which the absurdity and injustice of applying the provision to the case, would be so monstrous, that all mankind would, without hesitation, unite in rejecting the application.”
I am, therefore, of opinion that there is error in the judgment of the circuit court: that the judgment should be reversed, the verdict set aside, and the cause remanded to the court below, for a new trial to be had therein, pursuant to the law as held in this opinion.