[No. 11137.    Department One.— June 9, 1888.]

## M. V. HELM, RESPONDENT, v. J. G. WILSON, APPELLANT.

DEED — MISTAKE IN DESCRIPTION. — The fact that a deed describes the land conveyed as being the southeast quarter instead of the southwest quarter of a quarter-section named is not controlling. If the land really intended to be conveyed can be identified by monuments actually fixed upon the ground, then the mistake as to the subdivision in which it is situated may be rejected as *falsa demonstratio*.

ID. — EJECTMENT — NONSUIT. — When both parties to an ejectment suit are in possession, claiming a part of the land conveyed by a mistaken description of the quarter-quarter-section, and the only question between

them is as to where were its exact eastern and western boundaries, a motion for nonsuit because of the mistaken description in the conveyance is properly overruled.

EJECTMENT — EVIDENCE — CONTRACT OF SALE — EQUITABLE TITLE — DIVISION LINE. — The defendant in an action of ejectment is entitled to prove a contract of sale under which he entered into possession and erected improvements, whereby he became the equitable owner of the land, and as such dealt and agreed with the plaintiff's grantor as to a division line. He is entitled to show by his contract his relations to the land and to the adjacent owner.

COTERMINOUS OWNERS — AGREEMENT AS TO DIVISION LINE — STATUTE OF LIMITATIONS. — Where coterminous owners agree as to a division line between them, in which they acquiesce, and under which they occupy for a period equal to that fixed by the statute of limitations, the line thus established is binding upon them, and those holding under them or either of them, without reference to the existence of any dispute as to the true line.

ID. — IMPLIED AGREEMENT — IMPROVEMENTS — ACQUIESCENCE — ESTOPPEL IN PAIS. — If two coterminous owners trace their dividing line without any agreement more than is implied from their acts, and, both recognizing it as such, one goes forward, with the knowledge and acquiesence of the other, and makes such valuable improvements as to work great injury to the party making them if the line be disturbed, the other will be estopped from afterward alleging such mistake as shall deprive the owner of his improvements, especially if the party seeking to disturb the line knew, or had the means of knowing, at the time the improvements were made, all that he subsequently learned.

APPEAL from the judgment of the Superior Court of Mendocino County, and from an order refusing a new trial.

The facts are stated in the opinion.

*J. T. Rogers*, for Appellant.

*J. A. Cooper*, and *T. L. Caruthers*, for Respondent.

BELCHER, C. C.—The plaintiff owns two acres of land, and the defendant one acre. The parcels are adjacent, the plaintiff's land lying east of defendant's. The question in the case is as to the location of the line dividing the parcels. The plaintiff claims that the line is about twenty-two feet west of the line claimed by defendant, and he brought this action to recover from defendant possession of the disputed strip.

The case was tried before a jury, and the verdict and judgment were for the plaintiff. The defendant moved for a new trial, and has appealed from the judgment and order denying his motion.

Both parties deraign title through mesne conveyances from Mrs. William Henry, who, prior to September, 1877, owned the south half of the quarter-section in which the "strip" is situated.

The plaintiff proved that on the fourth day of September, 1877, Mrs. Henry conveyed to E. Barnett four acres of land, described as "lying on the south side of and within the southeast quarter" of the quarter-section referred to," commencing at an iron stake in the center of the road, on the south line of said described land, near a creek running in a westerly direction, on or near said south line," and extending north 12.65 rods, and west 50.60 rods; that on the same day, and within a few minutes after he received his deed, Barnett conveyed to F. B. Layton the east half of the four acres so conveyed to him, and thereafter, on the 28th of June, 1883, Layton conveyed the same to the plaintiff; that on the 12th of April, 1883, Barnett conveyed to the defendant one acre, being part of the original four-acre tract described as commencing at a point 25.30 rods west from the iron stake mentioned in the deed from Mrs. Henry, and extending north and west 12.65 rods.

The plaintiff also proved that the four-acre tract was situated in and was a part of the southwest quarter of the quarter-section referred to, and not in the southeast quarter thereof; that at the time of the conveyance by Mrs. Henry the tract was surveyed and its corners staked, an iron pin or stake being placed at the southeast corner thereof, and that the iron pin was then where it was placed at the time of the survey; that, measuring from the iron pin, according to the calls of his deed, the strip in dispute was a part of the two acres conveyed to him.

When the plaintiff rested his case the defendant moved for a nonsuit, on the ground that plaintiff had failed to show that the strip of land in controversy was within the southeast quarter of the quarter-section described in the complaint, and had shown that the said southeast quarter was still owned by Mrs. Henry. The court denied the motion, and the defendant excepted to the ruling.

The defendant then offered in evidence a written contract, by which Barnett agreed to convey to him the one acre subsequently conveyed, and he agreed to erect upon the premises a framed house of two-stories in height, to be covered on the outside with rustic, and the lower story to be finished and painted for the purposes and uses of a store, the contract reciting that "it is understood that the said party of the second part is to have the sole use, possession, and enjoyment of said property, to rent the same and to use it as his own property in a lawful manner." The contract was dated August 17, 1878, was signed by both parties and duly acknowledged, and on the 5th of November, 1878, was recorded in the county records.

The plaintiff objected to the contract being received in evidence, on the ground that it was immaterial and incompetent, and that he was not in privity with it. The court sustained the objection, and the defendant reserved an exception.

The defendant proved that he went into possession of the land contracted to be sold to him, and in 1878 built a house thereon twenty-four by forty feet, and two stories high. He also arected a fence along what he supposed to be his east line, which line is the east line of the now disputed strip. About one hundred feet of this fence was burned down in 1881, and was rebuilt by defendant in 1884. Defendant also in 1884 erected on the south end of the disputed ground a two-story building, the lower story being intended for a saloon. One McClasky

built a part of the original fence. He was called as a witness, and having stated that he knew the parties to the action and Layton, and the land in controversy, was asked: —

" Q. — Do you know where the fence was built across it, near the middle of the four-acre tract of land? A. — Yes, sir.

" Q. — Who built that fence? A. — I built a portion of it.

" Q. — Under whose direction? A. — Under Mr. Wilson's.

" Q. — What directions did Mr. Wilson give you at the time? A. — He told me to go and see Mr. Layton.

" Q. — Did you have any conversation with Layton? A. — Yes, sir.

" Q. — Now, what was said by Mr. Layton at that time? A. — He pointed out the mark he had on the fence; he said there was as far as his land went.

" Q. — On what fence? A. — On the picket fence that was on the north side of Layton's lot.

" Q. — A picket fence that ran east and west along the north boundary of the four acres? A. — Yes, sir; on the north boundary.

" Q. — What was done by you and Layton at that time? A. — Well, I told him that Mr. Wilson wanted me to put up a chicken-house and chicken-yard there, and wanted me to put it on the line. I told him I would set the post there, and he would tell me where to put it. I walked out and held up a stake, and he told me when it was right, and I built the fence accordingly.

" Q. — Where did Mr. Layton stand at that time? A. — He stood at the north.

" Q. — Which way did Mr. Layton look at that time? A. — Looking south.

" Q. — What object did he sight by? A. — The post on the rail fence, — sighted to the road.

"Q.—Did he tell you that he looked at that?  A.—
Yes, sir.

"Q.—Where was it?  A.—It stood on the south side.

"Q.—Did you see the post?  A.—I saw the post.

"Q.—Where did you put the fence with reference to
the marked line?  A.—I placed it right on the line.

.    .    .    .    .    .    .

"Q.—How far across the lot did you build?  A.—I
suppose about thirty yards.

.    .    .

"Q.—Do you know whether there was a fence after-
ward built from the corner of the chicken-yard, where
you left it, clear across to the front?  A.—Yes, sir.

.    .    .    .    .    .

"Q.—What was it Mr. Layton said when he pointed
out this notch on the fence, about his land?  A.—He said
that was as far as his land came.

"Q.—Was this fence afterward built on the line, as
you got it from him, from the chicken-yard across?  A.
—It was built on the same line as the fence I built."

The defendant was a witness in his own behalf, and
testified: "I have known this four-acre tract for twenty-
six years, and I have been in possession of this 'strip'
since 1878; on the one-acre tract which I got from Bar-
nett, I built, in 1878, a house twenty-four by forty feet,
and two stories high; I fenced the lot; a part of the fence
was the one to which McClasky testified; I have used it in
various ways up to the line pointed out by Layton in 1878,
no one has ever claimed any of it except me; . . . .
a portion of the fence was burned down when Layton's
house was burned; it was again built in the spring of
1884, under these circumstances: They wanted a divis-
ion fence there, and I sent some of my boys over there
to set up some posts and rebuild it; they went over there
and set some posts, first commencing at my store and
running up to the corner, and then commenced setting
posts to run north, and the plaintiff said they were set-

ting the posts wrong,—not setting them to conform to old line,—and they quit; I afterward went there, and the plaintiff and I pulled up some of the posts and strung them along to suit his notions of the line; afterward I had the fence built on the line on the east side of the 'strip' indicated then by the plaintiff; this was before I commenced to build the saloon; the plaintiff did not object to my building the fence, nor claim any of the land west of the fence; we pulled up and reset four or five posts; the old stubs were there to go by; it had been burned for about one hundred feet."

Layton was called as a witness for plaintiff, and testified: "I know the plaintiff and defendant and the 'strip' in dispute. I am the grantor of the plaintiff, and was present in 1877 when Taylor surveyed the four acres; I set the corner stakes or pins; . . . . when I sold to plaintiff I showed him my boundaries, though I did not point out the iron pin to him; I don't know that I showed him the western boundary. He could see my fence; I did not show him any land now included in the 'strip'; I did not show him any land as mine west of the fence McClasky built; I never told anybody that I claimed any part of the 'strip'; I used it before it was fenced, but I did not use or claim it as mine; after it was fenced I never claimed it; it was fenced about 1878 or 1879; up to this time there had been no controversy about the boundaries."

The plaintiff was called as a witness for himself, and testified: "I know the defendant; he is in possession of the twenty-two-feet 'strip'; . . . . in the spring of 1884 the defendant built a fence and house and horse-shed on this land; the house is two-story, about twenty by forty feet, and stands on the south end of the land, facing the street; it is about forty feet from defendant's store, and about fourteen feet from my dwelling-house; I was at home and saw the house being built; the defendant told me he was building it; I objected to its being built there,

because it was so near my own house; I did not object because I owned the land; I never thought I owned it; I never heard any one say the 'strip' belonged to my lot until we measured it, about a month before the suit was commenced; never claimed to own it till it was measured; I do not know that Layton ever claimed to own it; in 1881 there was a fence along the east side of this 'strip'; . . . . there was in 1881, and is now, a chicken-lot extending from the north boundary south on and along the east side of this 'strip' for about one third along the 'strip' in length; it had been there probably a year; from the southeast corner of the chicken-lot there was a fence, above spoken of, on and along the east side of the 'strip' on through to the street; Mr. Layton's house, on the two-acre tract, was burned in July, 1881, and at that time the said fence was also partly burned for about one hundred feet back from the street; the old stubs of the burned posts still stood in the ground; on this line, marked out by these old stubs, the defendant, in the spring of 1884, built another fence; his boys came and put down some posts; they did not set them on the old line, but east of it; I told them about it; they then quit; it was afterward built on the old line, marked by the stubs, by the defendant; about one month before the fence was built I had a conversation with the defendant; it was something like this: He said that he would furnish the lumber to build the fence on the old line if I would nail on the boards, and that I might nail them on my side, so as to have the smooth side to my house; the defendant and I reset some of the posts set by his boys; we put them on the old stub line; the defendant built the fence."

There was also testimony offered by defendant for the purpose of showing the original location of the northwest and southwest corners of the four-acre tract, and that, measuring from such southwest corner, the iron pin at the southeast corner must have been originally

placed farther east than it then was, but upon objection by the plaintiff, the testimony was excluded.

The court, at the request of the plaintiff, gave to the jury, among others, the following instruction:—

"I charge you that no parol agreement is good between parties in regard to real estate, except that when owners of adjoining tracts of land are uncertain about the true division line between them, and there is a dispute about the same, they may then agree upon a division line as the true line, and if they do so agree and erect a division fence upon what they agree upon as the true line, in such case the agreement of the parties would govern; but you must find, by a preponderance of testimony, that there was a dispute between the adjoining owners as to the true line, and that such line was agreed upon, or you cannot find for the defendant upon the theory of an agreed line."

1. We do not think the court erred in refusing to grant the defendant's motion for a nonsuit. The fact that each of the deeds described the land conveyed as being a part of the southeast quarter instead of the southwest quarter of a quarter-section named is not controlling. If the land really intended to be conveyed can be indentified by monuments actually fixed upon the ground, then the mistake as to the forty-acre subdivision in which it is situated may be rejected as *falsa demonstratio.* In this case both parties were in possession and claiming a part of the four-acre tract conveyed by Mrs. Henry, and the only question as to its location was as to where were its exact eastern and western boundaries.

2. We think the court erred in refusing to admit in evidence the written contract made between Barnett and the defendant. Under that contract defendant went into possession of the one-acre tract described, and erected improvements thereon. He became the equitable owner of the land, and as such dealt and agreed with

Layton as to its eastern line. He was entitled to show by his contract his relations to the land and to the adjacent owner.

3. We also think the court erred in giving the instruction above quoted. It in effect told the jury that no agreement between coterminous owners as to their boundary line is binding, unless there has been a *dispute* as to the true line. If this be sound law, then it must follow that in every case where a line is uncertain, though both parties agree as to where the line is, and erect thereon a division fence and acquiesce in that line for a long time, still, when the true line is discovered, the agreement and acquiescence will count for nothing, and the true line may be insisted upon. We think the *dispute* a false quantity, and that the instruction was misleading. In *Truett* v. *Adams*, 66 Cal. 223, the rule is said to be that " where it is proved that a line has been agreed upon, either expressly or by long acquiescence, as the dividing line between two tracts of land, courts will not disturb the line." In *White* v. *Spreckels*, 75 Cal. 610, it is said: " Where coterminous proprietors of land in good faith agree upon, fix, and establish a boundary line between their respective tracts of land, in which they acquiesce, and under which they occupy for a period equal to that fixed by the statute of limitations, the line as thus established is binding upon them, and those holding under them or either of them."

Here the division line was agreed upon, and the fence built, according to the testimony of Layton and the plaintiff, in 1878 or 1879, and this line was acquiesced in, according to the testimony of all the witnesses, until about a month before the action was commenced, which was on the 25th of November, 1884. If the time of building the fence was rightly given by Layton and the plaintiff, then it would seem that there was an acquiescence and occupancy for a period longer than that fixed by the statute of limitations to bar an action.

Beside, it appears that in 1884 the defendant, with the knowledge and acquiescence of the plaintiff, erected valuable improvements upon the disputed "strip." It has been held that, even without any agreement more than is implied from their acts, if two persons trace their dividing line, and, both recognizing it as such, one goes forward with the knowledge and acquiescence of the other, and makes valuable improvements, so valuable as to work great injury to the party making them if the line be disturbed, the other will be estopped from afterward alleging such mistake as shall deprive the builder of his improvements, and especially if the party seeking to disturb the line knew, at the time the improvements were made, all that he subsequently learned, or if he had the means of knowledge. (*Volde* v. *Vodicka*, 49 Mo. 98; 1 Wait on Action and Defenses, 718, and cases cited.)

Many other points are made, but they do not require special notice.

In our opinion the judgment and order should be reversed, and the cause remanded for a new trial.

FOOTE, C., and HAYNE, C., concurred.

The COURT.— For the reasons given in the foregoing opinion, the judgment and order are reversed, and the cause remanded for a new trial.