[L. A. No. 2460. In Bank.—April 19, 1910.]

## FRANK LOUSTALOT, Appellant, v. J. J. McKEEL, Respondent.

EJECTMENT FOR STRIP OF LAND—BOUNDARY.—SUPPORT OF FINDINGS FOR DEFENDANT—OWNERSHIP—ESTOPPEL.—In an action of ejectment for a strip of land claimed to bound defendant's land, where the court found that defendant owned the strip and also that plaintiff was estopped from asserting any claim to the property by virtue of an agreement between his predecessor in title and defendant establishing a common boundary between their lands, where there is sufficient evidence to support the finding of estoppel, it is immaterial whether the additional finding of title in fee is supported or not.

ID.—GENERAL RULE AS TO ESTOPPEL — UNCERTAIN BOUNDARY.—PAROL AGREEMENT—FENCE—CONTINUED OCCUPATION.—The rule universally sustained is that where the boundary line between the lands of con-

tiguous owners is doubtful or uncertain, and they by parol agreement
fix and determine a dividing line between their respective tracts, said
line being marked by the erection and maintenance of a fence or
other equivalent structure along it, and thereafter the parties hold
and occupy their respective lands to the boundary as so agreed on,
the accuracy of such boundary line cannot be subsequently ques--
tioned by the parties establishing or by those claiming under either
of them.

ID.—EVIDENCE OF ESTOPPEL—OVERLAPPING DEEDS—STABLE ON DEFEND-
ANT'S LINE—AGREED FENCE—OCCUPATION FOR SEVEN YEARS.—Where
the evidence shows uncertainty by the overlapping of the deeds of
plaintiff's predecessor and of the defendant, and that defendant had
erected a stable along the line claimed by him, and that it was
agreed between them that the line of such stable and of a fence
then erected therefrom by them to the rear of the lot should be the
common boundary between them, and that they continued to occupy
to such common boundary for a period of seven years up to the time
of the death of plaintiff's predecessor, such evidence establishes that
plaintiff as successor in interest of the deceased party is estopped
to claim any other boundary or to assert title to the original over-
lapping strip.

ID.—RULE OF CONCLUSIVE ESTOPPEL BY PRESCRIPTIVE OCCUPATION.—The
rule of law is that where parties in good faith establish a boundary-
line which may not be in fact the true line according to the calls
of their deeds, in which they acquiesce and according to which they
occupy their respective lands for a period equal to that prescribed
by the statute of limitations to bar a right of entry, both parties and
their successors in interest are conclusively estopped from questioning
it as the true line.

ID.—EQUAL KNOWLEDGE OF FACTS—ABSENCE OF FRAUD—IMMATERIALITY
OF MISTAKEN BELIEF—SETTLEMENTS OF BOUNDARY FAVORED.—Where
the parties in question had equal knowledge of the facts when they
entered into the agreement and no deception or fraud was practiced,
it is entirely immaterial whether the parties were right or wrong in
believing that the true line was exactly where it should be as they
established it.  Courts have always looked with favor on settlement
of questions of this character by the parties in interest themselves;
and when it appears that an agreement adjusting a disputed bound-
ary line has been fairly and definitely made between them, and they
have occupied their lands accordingly for a period longer than the
statutory period of limitations, such agreement is conclusive, no
matter whether they were mistaken or not in their belief that they
were locating along the true line.

ID.—STABILITY OF AGREEMENT—POLICY OF LAW.—If the fact merely
that the parties were mistaken as to where the true line lay could
invalidate their agreement, it could have no stability unless the agreed
line was in truth the exact line.  The policy of the law, however, is
to give stability to such an agreement, as a method adopted in good

faith by the parties themselves to settle the controversy and because it is the most satisfactory way whereby a true boundary line may be determined and tends to prevent litigation.

ID.—PAROL AGREEMENT SETTLING BOUNDARY NOT WITHIN STATUTE OF FRAUDS.—A parol agreement settling a disputed boundary is not within the statute of frauds. It is not a contract for the sale or conveyance of land. Nor do agreements of this character operate as a conveyance to pass title from one to another; but they proceed upon the theory that the true line of separation is in dispute and to some extent unknown; and in such cases the agreement serves to fix the line to which the title of each extends.

APPEAL from a judgment of the Superior Court of Santa Barbara County. Felix W. Ewing, Judge presiding.

The facts are state in the opinion of the court.

William G. Griffith, for Appellant.

C. A. Storke, for Respondent.

LORIGAN, J.—Plaintiff, alleging ownership in fee thereto, brought this action in ejectment to recover of defendant a strip of land 86 feet long and 9 and 8-10 feet wide at one end, and 4 and 6-10 feet wide at the other, lying along the common boundary line of the lands of the parties located in the city of Santa Barbara. The complaint was filed September 17, 1907. In his answer defendant denied title in plaintiff, asserted title in himself and set up an affirmative defense of estoppel, based upon the claim that in 1897 the common boundary line being in dispute between himself and the predecessor in title of plaintiff—one Mary A. Ashley—they agreed upon a boundary line which fixed the strip of land in dispute to be on the defendant's side of the line and that the line so agreed on was acquiesced in by the predecessor of plaintiff thereafter and up to 1906, when plaintiff succeeded to her interest in part of the adjacent property.

The court found that the defendant was the owner in fee of the strip in dispute and also that plaintiff was estopped from asserting any claim to the property against defendant by virtue of the agreement between his predecessor in title and defendant establishing a common boundary line between their lands.

Plaintiff appeals from the judgment accompanied by a bill of exceptions under which he attacks the sufficiency of the findings of title in defendant and the claim of estoppel.

We shall not discuss the finding as to title because we are satisfied that the finding of estoppel' was supported by the evidence and being sufficient of itself to sustain the judgment it is immaterial whether the additional finding of title in fee is supported or not.

Addressing ourselves to the evidence on the finding of estoppel, it appears that in 1869 one George Hartley purchased a lot fronting on State Street, being a part of block 229 in the city of Santa Barbara. The lot was rather indefinitely described in the deed, but along its southeasterly line ran a board fence, referred to in the deed as the southeasterly boundary thereof, and which divided the property he took possession of from an adjacent lot to the southeast then owned by one Mary B. Lake. The lots in the block, including those immediately referred to, were fenced off from each other. Hartley, on going into possession of the lot purchased by him, immediately built a stable upon it known as the "Dexter Stables," the building fronting on State Street and running back nearly 186 feet to the rear line of the lot. The southeasterly side of the stable, and subsequently a barn, were built along and upon the board dividing fence referred to in his deed as the southeasterly boundary line of his lot, and as constructed, embraced within their inclosure, as part of the land described in his deed, the strip in dispute except a few feet at the rear. In 1879 one Mary A. Ashley purchased from Mary B. Lake, above referred to, the lot to the southeast and adjacent to the Hartley stables. The deed to Mary A. Ashley, as did all of the deeds from her predecessors in title, called for a frontage on State Street of 195 feet running northwesterly along that street from its intersection with Haley Street (being the south corner of block 229) with a uniform depth northerly through the block of 450 feet. The northwesterly line of the lot (the boundary line between it and the lot of Hartley) ran at right angles to State Street. We mention this particular call for the frontage on State Street to refer to it again presently. In 1893 one McPhail, successor in interest of Hartley, conveyed the lot on which the Dexter Stables were located to defendant. Now, while

the description in the deed to Hartley included the strip in question by reference to the board fence on the southeasterly line of the lot, and the deed from him to McPhail described the land conveyed explicitly by courses and distances, and generally as the "premises known as the Hartley stable and corral," the deed to the defendant did not in terms include this strip. The deed to him was for 90 feet frontage on State Street running northerly along that street from a point 137 feet northerly from the intersection of State and Haley streets (being the southern corner of block 229), with the southeasterly line running in depth 186 feet at right angles with State Street. As the board fence referred to in the Hartley deed, and along and upon which the southeast wall of the stable and barn was built, did not run at right angles with State Street, the strip was not included in the deed to defendant calling for the southeasterly line of his lot as being one run at right angles to State Street. However, the defendant went into possession of the premises under his deed assuming that it embraced the strip in controversy upon which the stables partially stood.

In the early part of the year 1897 while Mary A. Ashley and the defendant were so in possession of their adjacent lots, physically divided by the southeast wall of the stable and barn, the former had a survey made of the land called for in her deed, and thereafter wrote to the defendant stating that his barn was on part of her property, and that while she did not wish to sell the land she was willing to rent it to him. Defendant called to see her about the matter, taking with him his abstract of title, and she and her attorney and defendant went over it together and discussed the matter of the accuracy of the line. At first she claimed all that her deed called for. In this connection it will be observed that, eliminating for the moment this strip in question, there was a marked and decided conflict between the calls in the deeds of Mrs. Ashley and the defendant as to the dividing line between their lots. It is not pretended that Mrs. Ashley, or her predecessors in interest, ever had any valid claim of title to any portion of the lot actually described in the deed to defendant, or to any part of the land inclosed by the southeast wall of the stable and barn, except a narrow piece of which the strip in controversy is a part, extending from State Street northeasterly to the rear of defend-

ant's lot. Yet it will be observed, from the calls in the respective deeds of Mrs. Ashley and the defendant, that the deeds largely overlapped each other. The deed to Mrs. Ashley called for a frontage of 195 feet running along State Street from the south corner of block 229; the deed to defendant called for a frontage of 90 feet running along State Street from a point on that street 137 feet distant from the same south corner of the block. The deeds overlapped each other in frontage on State Street and in depth, the difference between 137 and 195 feet, or 58 feet. Mrs. Ashley under her deed could claim 195 feet along State Street, while the deed of defendant called for 58 feet of this same frontage. This strip ran all through the land of the defendant and the calls of the respective deeds clearly left the true dividing line between their lands in uncertainty and doubt. But, while at first Mrs. Ashley claimed all that her deed called for, the dispute between herself and the defendant settled down to the narrow strip along their line and upon which the stables and barn were built. Mrs. Ashley insisted that under the deed to her the dividing line should run at right angles to State Street which would entitle her to the strip. The position of defendant was that the barn "had to follow the board fence," (referred to in the deed to Hartley) and had in fact followed it. After examining the abstract and discussing the matter between them, Mrs. Ashley conceded that the claim of defendant was correct and that the line upon which the barn was built was the true line between their respective properties. At the time of this conference and adjustment as to the boundary line there was a small piece of the strip extending from the barn to the rear of the lot which had not been built on or inclosed by defendant or his predecessors. A few days afterwards Mrs. Ashley of her own volition, and at her own expense, had a fence built extending from the barn to the end of defendant's lot along the same line of the strip on which the stable and barn were built prolonged northeasterly so as to make an actual southeasterly line between the properties of both parties. After this agreement as to the true boundary line and the building of the fence, the line of the stable and fence as built by Mrs. Ashley were recognized by both parties as the true line dividing their property. Neither Mrs. Ashley nor any of her predecessors in title were ever in

possession of the strip of land in dispute. No question was ever subsequently made between Mrs. Ashley and the defendant about the dividing line. As agreed to it was acquiesced in as the true dividing line between their properties for some seven years thereafter and up to the time of the death of Mrs. Ashley in 1904 and until plaintiff purchased a portion of the adjacent lot from her estate. This was some two years subsequent to her death, and the deed from her executors included the portion of the strip for which this action was brought.

Upon this evidence the court was warranted in finding that by the agreement between Mrs. Ashley and the defendant, recognizing and establishing the line along which the stable, and thereafter the fence, was built, as the true dividing line, and also by acquiescence in it as so established for almost seven years, the plaintiff as the successor in interest of Mrs. Ashley was estopped from asserting title to the strip in controversy.

The rule universally sustained by the authorities is that where the boundary line between the lands of contiguous owners is doubtful or uncertain, and they by parol agreement fix and determine a dividing line between their respective tracts, said line being marked by the erection or maintenance of a fence or other equivalent structure along it, and thereafter the parties hold and occupy their respective lands to the boundary as so agreed on, the accuracy of such boundary line cannot be subsequently questioned by the parties establishing it, or by those claiming under either of them. (*Cavanaugh* v. *Jackson*, 91 Cal. 580, 583, [27 Pac. 931]; *Dierssen* v. *Nelson*, 138 Cal. 394, 398, [71 Pac. 456]; *Young* v. *Blakeman*, 153 Cal. 481, [95 Pac. 888], and other authorities cited in those cases.

That there was an uncertainty as to the line between their lots according to the calls of their deeds when Mrs. Ashley and the defendant agreed upon and established a dividing line is hardly open to serious question. The calls of their deeds were widely divergent as to it. The deeds overlapped each other to an extent of 58 feet, and while no claim was insisted upon by Mrs. Ashley that the northwesterly line of her lot extended into the land of defendant as far as her deed called for it, still if it did not extend there it was uncertain where it was to be located, and while in the end, the dispute between them was brought down to whether the true

line should run along the old board fence, which physically
divided for many years the lands of which she and defendant
were actually in possession, or at right angles to State Street,
there was nothing in her deed which specifically called for its
location along the line which she claimed controlled. The
northwesterly line of her lot was 58 feet beyond the line
which she was contending for, according to the call of her
deed, and embraced to that extent land of the defendant to
which she did not insist that she had any claim, and to
which it must be conceded she had none. It is true that the
deed to the defendant did not fix his line along the board
fence, upon which the stables and barn were built, which
was the actually disputed line, but he was in possession of
it and of the strip in controversy as included within that
line, as his predecessors had also been for a great many years.
Had a controversy arisen between Hartley and Mrs. Ashley
there can be no question but that under the calls of their
respective deeds the boundary line was uncertain, and we do
not perceive how it could be considered the less uncertain, as
far as the calls of the deed of Mrs. Ashley are concerned,
when the dispute as to it arose between her and the defendant.

But if it be conceded that according to the calls of Mrs.
Ashley's deed there could be no question of the true location
of the dividing line; that, as claimed by counsel for appellant,
it was and is capable of ready ascertainment and location
as running at right angles to State Street, so as to include
the strip in question, and that the parties were mistaken in
believing that what they established to be the true line was in
fact the true line, still the rule of law is that where parties in
good faith establish a boundary line which may not be in fact
the true line according to the calls of their deeds, and in which
they acquiesce and according to which they occupy their
respective lands for a period of time equal to that prescribed
by the statute of limitations, both parties and their successors
in interest are conclusively estopped from questioning it as the
true line.

As said in the early case of *Sneed* v. *Osborn*, 25 Cal. 619,
626: "The authorities are abundant to the point that when
the owners of adjoining lands have acquiesced for a consider-
able time in the location of the division line between their
lands, although it may not be the true line according to the

CLVII Cal.—41

calls of their deeds, they are thereafter precluded from saying it is not the true line. The better opinion is that the considerable time mentioned in the cases must at least equal the length of time prescribed by the statute of limitations to bar a right of entry." (*Columbet* v. *Pacheco,* 48 Cal. 395; *Cooper* v. *Vierra,* 59 Cal. 282; *Johnson* v. *Brown,* 63 Cal. 391; *White* v. *Spreckels,* 75 Cal. 610, [17 Pac. 715]; *Helm* v. *Wilson,* 76 Cal. 476, [18 Pac. 604]; *Cavanaugh* v. *Jackson,* 91 Cal. 580, [27 Pac. 931]; *Dierssen* v. *Nelson,* 138 Cal. 394, [71 Pac. 456]; *Lewis* v. *Ogram,* 149 Cal. 505, [117 Am. St. Rep. 151, 87 Pac. 60].)

There can be no question under the evidence but that Mrs. Ashley and the defendant deemed the matter of the location of the true line uncertain. It may be that they were in error in this respect and that a careful examination of their respective titles by an attorney, and accurate surveys of their lots according to the calls of their several deeds, would have fixed an absolutely correct boundary line between them. But whatever might have been possible in this respect, the fact is that the true location of the line was considered uncertain and was definitely fixed between them, acquiesced in without question for years, and each occupied their lands thereafter according to the agreed line. When they entered into the agreement both had equal knowledge of the facts and no deception or fraud was practiced. Under these circumstances it is entirely immaterial whether the parties were right or wrong in believing that the true line was exactly where it should be as they established it. They were certainly in doubt as to where it should run, and adjusted the matter by making a practical location of the line where they thought it ought to be, and having acquiesced in it as so established, and having occupied their lands under the location for almost seven years—a longer period than prescribed by the statute of limitations to bar a right of entry—the line they established is conclusively determined to be the true divisional line. Courts have always looked with favor on the settlement of questions of this character by the parties in interest themselves, and when it appears that an agreement adjusting a disputed boundary line has been fairly and definitely made between them, and they have occupied their lands accordingly for a period longer than the statutory period of

limitation, such agreement is conclusive no matter whether they were mistaken or not in their belief that they were locating it along the true line. It is quite obvious that if the fact merely that the parties were mistaken as to where the true line lay could invalidate their agreement, there never could be any stability attached to such an agreement unless the line agreed on was in truth the exact line. The policy of the law, however, is to give stability to such an agreement as a method adopted in good faith by the parties themselves to settle the controversy, and because it is the most satisfactory way whereby a true boundary line may be determined, and tends to prevent litigation. (*Cavanaugh* v. *Jackson*, 91 Cal. 583, [27 Pac. 931].)

There is nothing in appellant's point that the agreement being in parol was within the statute of frauds. The agreement was not a contract for the sale or conveyance of land. Its only object was to settle a disputed question of boundary, and, as said in *White* v. *Spreckels*, 75 Cal. 616, [17 Pac. 717]: "Agreements of this character are not subject to the objection that they are within the statute of frauds, because they are not considered as extending to the title. They do not operate as a conveyance so as to pass title from one to another, but they proceed upon the theory that the true line of separation is in dispute and to some extent unknown, and in such cases the agreement serves to fix the line to which the title of each extends."

The judgment appealed from is affirmed.

Angellotti, J., Shaw, J., Sloss, J., Henshaw, J., and Melvin, J., concurred.