[L. A. No. 3299.   In Bank.—March 4, 1915.]

## W. T. WHEATLEY, Respondent, v. SAN PEDRO, LOS ANGELES & SALT LAKE RAILROAD COMPANY (a Corporation), Appellant.

DEED—CONFLICTING DESCRIPTIONS OF LAND—REFERENCE TO MAP.—Under
the rule for construing the descriptive part of a conveyance of real
property, as contained in subdivision 6 of section 2077 of the Code
of Civil Procedure, whereby a map referred to in such description,
when the reference is inconsistent with other particulars therein,
controls the description if it appears that both parties acted with
reference to it, the words, "along the south bounds of Wilmington,"
such being a town incorporated by the legislature with bounds fixed
by a recorded map and having as its southern boundary the line of
high water mark of San Pedro Bay, must control in a deed as against
other words in the description inconsistent with these.

ID.—BOUNDARIES—STATEMENT OF QUANTITY OF LAND.—Where in an in-
strument of conveyance of real property the quantity of land to be
conveyed is stated, the statement is not to be viewed as a factor in
establishing boundaries unless the more particular description given
is indefinite and uncertain.

ID.—DIVISION LINE—ESTABLISHMENT BY AGREEMENT OR ACQUIESENCE.—
In order that a division line shall become fixed, there must be an
agreement between the parties concerned, and this agreement must
be express, or else implied from the acts of the parties and ac-
quiesced in by them during a period long enough to satisfy the
statute of limitations.

ADVERSE POSSESSION — SUFFICIENCY OF POSSESSION—NECESSITY OF
ACTUAL OCCUPANCY OF WHOLE TRACT.—Where a tract of land is
claimed adversely under color of title, the possession that will be held
sufficient is not necessarily an actual possession and occupancy of the
whole; but if some part of the tract has been subjected to the con-
tinuous possession of the claimant, this possession may extend to the
whole, for the possession of one who enters under color of title and
who sets up a prescriptive claim may be in part constructive.

ID.—CONSTRUCTIVE POSSESSION—EXTENT REQUIRED.—In order that the
rule of constructive possession shall benefit an adverse claimant, it
must appear that the portion of the land on which he plants his
hostile possession is a part of that claimed adversely; for he cannot,
under a deed which conveys a good title to a portion of a tract and a
colorable one only to another portion of it, take possession of the
portion to which he has received good title and by so doing maintain
the claim that constructively he is in possession of the whole tract.

ID.—ACTION TO RECOVER REAL PROPERTY—STATUTE OF LIMITATIONS—
CONSTRUCTION OF CODE SECTIONS.—Section 322 of the Code of Civil
Procedure defining constructive adverse possession of land where the
possession is taken under color of title, is a part of the statute of
limitations, and is intended to prescribe a rule to determine the time
within which an action to recover real property, or an action arising
out of the title thereto, must be begun in order to avoid the bar of
sections 318 and 319 relating thereto; and these sections all must be
read in connection with section 312, declaring that, in order to set
the various periods of limitation running, there must first be a cause
of action, since the period begins to run only "after the cause of ac-
tion shall have accrued." Consequently it is a necessary condition to
the application of section 322 that the occupancy be of such a charac-
ter that it would constitute a cause of action by the owner of the
senior title.

ID.—CONFLICTING DEED — BOUNDARIES — COTERMINOUS OR INTERFERING
BOUNDARIES.—If the boundaries in conflicting deeds are coterminous,
the occupancy of any part of the tract by the owner of the junior
title is an invasion of the right of the previous grantee and creates
a cause of action in his favor. In such a case the constructive ad-
verse possession extends to the entire tract. But if the boundaries
given in the respective deeds of the two claimants are not coter-
minous, but only interfere, the senior owner has no cause of action
and, consequently, there is no constructive possession against him,
unless some part of the land embraced in his deed is occupied by the
junior holder.

ID.—LIMITATION OF ACTIONS—SECTION 322 OF CODE OF CIVIL PROCEDURE
—WORD "PROPERTY."—The opening clause of section 322 of the
Code of Civil Procedure reading, "When it appears that the occu-
pant, or those under whom he claims, entered into possession of the
property under claim of title," must be understood to refer to the

property of the opposing owner, as distinguished from that described in the instrument constituting the color of title; that the property upon which he must enter to start his adverse claim against the true owner must be some part of the property of that owner.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order refusing a new trial. Frank G. Finlayson, Judge.

The facts are stated in the opinion of the court.

A. S. Halsted, W. F. Palmer, Wilfred M. Peck, and F. A. Waters, for Appellant.

Woodruff & McClure, for Respondent.

SHAW, J.—This cause having been transferred to the district court of appeal for the second district, that court, upon an opinion by Mr. Justice James, affirmed the judgment and order appealed from. The cause was then transferred to this court for rehearing. Upon further consideration, we adhere to the decision of the district court and adopt its opinion, which is as follows:

"Action to quiet title to certain lands. From the judgment in favor of plaintiff, and an order denying defendant's motion for a new trial, appeals were taken.

"The lands as to the title to which controversy is made are lands lying along the northerly shore of the bay of San Pedro in Los Angeles County. These lands, together with those composing the entire townsite of the city of Wilmington and lands east and south thereof, were originally owned, under the name of Rancho San Pedro, by one Christopher Dominguez, whose title rested on a grant from the Spanish government. The heirs of Dominguez, in the year 1855, conveyed to B. D. Wilson, John G. Downey, and four others the tract of land upon which the town of Wilmington was afterwards platted. The conveyance was to the grantees as tenants in common. In general the southerly boundary of the tract so conveyed was fixed at the line of high-water mark on the bay. The description given in the deed traced a course from the intersection of the westerly boundary of the tract with the line of the bay, easterly until a point on the shore line designated as 'B' was reached. The point where the easterly boundary intersected

the shore line of the bay was designated as 'C.' The high-water mark between points 'B' and 'C' made a meandering line and mainly followed a course southerly of a straight line drawn between points 'B' and 'C.' The diagram accompanying this opinion is referred to as illustrating roughly the conditions just described.

"It then appears that a straight line drawn between 'B' and 'C' would leave between such line and high-water mark an irregular-shaped plat of ground. A portion of this ground is the land about the title to which this litigation revolves. The deed of conveyance by the Dominguez heirs to the grantees hereinbefore mentioned described the southerly line of the tract, after the point 'B' was reached, as follows: 'From the said point 'B' unto a stake marked 'C,' following the ordinary high-water mark, and distant in a straight line sixteen hundred and nineteen yards and three inches, with the course by

compass east 47° north,' etc.   In the year 1855 a decree of
partition entered in the district court of the county of Los
Angeles partitioned the land of the Rancho San Pedro among
the Dominguez heirs and their grantees, and the description
quoted from, which refers to the southerly boundary of the
tract deeded to Wilson et al., was incorporated into the decree.
In 1862, in the same district court and in case No. 877, a par-
tition by decree was made of the tract purchased by Wilson
and others.   In this suit of partition the referees appointed
one Frank Lecouvreur, a surveyor, to assist them, and he
prepared a map of the tract showing the boundaries thereof.
The tract as delineated upon this map was also subdivided
into blocks with streets between them, which blocks composed
the townsite of the city of Wilmington thereafter incor-
porated.   The subdivision was at that time designated by the
name of 'New San Pedro.'   The interlocutory decree entered
in action No. 877 described the boundary line between the
points 'B' and 'C' in substantially the same terms as were
used in the deed from the Dominguez heirs to Wilson et al.,
and in the decree in the first partition suit.   In the final
decree in this second suit (No. 877) were these clauses: 'Hav-
ing reference, in the descriptions in this decree, for fuller
explanation, to the map made by Frank Lecouvreur, the
surveyor appointed by said referees to assist them in said
partition, which map was submitted by the referees with
their said report and filed herein with said report.   And it is
further ordered . . . that the entire tract of land included
within the exterior boundaries of said map be and shall be
partitioned between the parties in this suit, the said tract
being . . . described as follows: ''Commencing at the point
known as 'Los Barriles,' marked 'Station A' on said map;
thence following the line of ordinary high-water mark, east-
erly as far as the point marked 'C' on said map, or where the
eastern exterior boundary of said tract of land will intersect
said ordinary high-water mark, the courses and distances
from said point 'A' to station 'C,' according to said map,
being as follows: . . . links to station 'B'; thence north 43°
east seventy-three (73) chains, sixty (60) links to station 'C'
. . . the same being the resurvey of the lands first described
in the complaint in this case,  and in said former decree of
date September 6, 1862, i. e., the interlocutory decree, except-
ing from said lands the strip of one mile in length by one

hundred yards in width within said estuary whereon the said lands are situated, commencing from station 'B.' '' On the map filed with the referees' report in case No. 877 the side lines of the blocks were not shown extended through to high-water mark, but all such lines intersected a straight line drawn from 'B' to 'C.' The decree of partition adopted the subdivision lines shown on the map, but in alloting the blocks fronting the bay between points 'B' and 'C,' extended the side-lines of such blocks through the straight line drawn from 'B' to 'C' by recitation in each case as follows: 'Extending its east and west line southerly across . . . to ordinary high-water mark.' Following this decree, a map was drawn and filled for record in the county recorder's office, which map was a duplicate of the map filed with the referees' report, except that the blocks within the subdivision were not numbered, but were lettered according to the township as allotted under the decree, and except also that the side lines of the blocks were shown thereon extended through the straight line drawn from 'B' to 'C' and extended to what appears to be the mark made by the waters of the bay. The various instruments of conveyance hereinbefore mentioned and the decree of partition contained, (referring to the entire tract allotted to Wilson and others), and after the terms of description referred to, this clause: 'So as to include neither more nor less, but exactly 2400 acres of land within the above described limits.'

"Defendant's claim of title to the strip of land in controversy is based, first, upon a deed from the Dominguez heirs. These heirs, in 1892, deeded to the Terminal Land Company, the grantor of defendant, a large body of land lying easterly of the tract previously granted to the predecessors in title of the plaintiff, and immediately adjoining it. In the deed to the Terminal Land Company the dividing line between points 'C' and 'B' was described as follows: ' . . . to station C of Wilmington; thence along the south boundary of Wilmington, south 56 and ½ degrees west, 73 and 60/100 chains to station B of Wilmington.' By the testimony of a surveyor it was shown that the course of the boundary as described in this deed by angles and distances from station 'C' to 'B' was along a straight line. The Terminal Land Company in 1892 prepared a map of its lands lying easterly of the town of Wilmington. Lot 3 as designated on this map had for a

portion of its northerly boundary the straight line 'C-B.'
This map was recorded in the office of the county recorder
and thereafter was used by the assessors of the county of Los
Angeles, the city of Wilmington, and later the city of Los
Angeles, in making up the tax-rolls.   It was shown that de-
fendant had paid all of the taxes assessed against the land in
controversy for more than five years prior to the commence-
ment of this action.   The negative fact was also shown that
the owners of the land lying north of the straight line 'B-C'
had not evidenced their claim of title to the lands in dispute
by improving or entering upon actual possession of the same
until a short time before the commencement of this action.
It was also shown that neither the defendant nor its immedi-
ate predecessor in title had improved the land in dispute, nor
entered into actual possession of the same by the making of
any use thereof, until just prior to the time plaintiff com-
menced his action.   Various improvements had been made
more than five years prior to the commencement of the suit
on the land easterly and southerly of the disputed ground,
and upon the tract designated generally as 'Lot 3' on the
map made by the Terminal Land Company being the map
before mentioned as having been recorded and used by the
city and county assessors.   In 1872 the city of Wilmington
was incorporated by an act of the legislature (Stats. 1871-2,
p. 108).   The description of the municipal boundaries used
in that act were those found in the deeds of the Dominguez
heirs to Wilson et al., and the recorded Lecouvreur map
(showing the disputed boundary to be along the water's edge)
was referred to in the act and expressly adopted as the official
map of Wilmington.   The act of incorporation was repealed
in 1887, and the town was re-incorporated as a city of the
sixth class in 1905.   The main facts upon which the judg-
ment was based have now been fairly stated.

It is contended by appellant that the facts are such as to
compel a judgment in its favor because:

"First. The description used in the early conveyances
should be construed as indicating a straight line between the
points 'B' and 'C'; that the map filed in partition suit No.
877 delineated that line as running in a direct course between
the points named, and that this map should control other
language of the decree inconsistent therewith; that should
the southerly line of the tract be fixed at the high-water mark,

then more than the intended amount of land would have
been included in the grant, which parcel was to be composed
of 'neither more nor less, but exactly 2400 acres.'

"Second. That conceding the location of the boundary be-
tween 'B' and 'C' to be a matter of uncertainty under the
various instruments of conveyance and decrees of partition,
it had become fixed and certain by long acquiescence and
agreement as being located along a straight line.

"Third. That appellant has obtained a prescriptive title to
all of the ground in dispute.

"The terms of description used in the conveyances, and
also the partition decrees, were reasonably clear and certain;
they all defined the line between points 'B' and 'C' as fol-
lowing the ordinary high-water mark. The statement that
the point 'C' was distant from 'B' 'in a straight line 1619
yards and 3 inches,' fixed the location of 'C' more definitely,
but did not purport to be used in limitation of the other spe-
cific terms of description by which the southerly boundary
had already been fixed as being along the line of ordinary
high water. Section 2077 of the Code of Civil Procedure, is
cited in support of the contention that the map filed in the
partition suit determined 'B-C' to be a straight line. It will
be remembered that the particular description in the decree
carried the side lines of the blocks of land through to high-
water mark. The plat recorded in the office of the county
recorder, made after the partition was made, also showed the
side block lines so extended. This last map was one appar-
ently filed for the benefit of the partitioning parties and it
showed that they construed the decree as providing for the
partitioning of the property down to the water's edge. Sec-
tion 2077 of the Code of Civil Procedure, provides rules for
construing the descriptive part of a conveyance of real prop-
erty where the description is doubtful. Subdivision 6 of that
statute reads as follows: 'When the description refers to a
map, and that reference is inconsistent with other particulars,
it controls them if it appears that the parties acted with
reference to the map; otherwise the map is subordinate to
other definite and ascertained particulars.' Admitting for
the moment that the descriptive terms contained in the deed
from the Dominguez heirs to the predecessors in interest of
the plaintiff were indefinite, it must appear clearly that the
original parties all relied upon the high-water mark as con-

stituting the southerly boundary of the Wilmington tract. The decree of partition in case No. 877 was not controlled by the map filed in connection with the referees' report. That decree contained definite terms of description—sufficient to enable a surveyor to trace the course of the southerly boundary without the aid of the map. The recorded map followed the decree in delineating the block lines as extending to the water's edge.

"From what has been stated it may be understood that the view the court takes is that the particular descriptions used in the deeds of the Dominguez heirs to the predecessors in title of plaintiff and in the partition decrees referred to, clearly and sufficiently describe the boundary line between the points 'B' and 'C' as being located at the line of high water. The deed of the Dominguez heirs to the Terminal Land Company did contain inconsistent terms of description. It has been noted that this deed in particular described the line between 'B' and 'C' along a straight course. At the same time it described that course first as being 'along the south boundary of Wilmington.' The south boundary line of the municipality of Wilmington had been fixed by the act of 1872, whereby the recorded Lecouvreur map had been adopted as the official map of the city and the particular description of the boundary of the municipality between points 'B' and 'C' had been described in the terms of the original conveyance to Wilson et al. In this deed the points 'B' and 'C' were referred to as established monuments and were identified further as being referable to the Lecouvreur survey. The phrase used in the deed, that the line between points 'B' and 'C' was along the south boundary of Wilmington, constituted a term of definite description, notwithstanding that the act of 1872 incorporating the city of Wilmington had been repealed by the act of 1887. Wilmington was not re-incorporated until 1905. So far as the testimony shows, the south boundary line of Wilmington was the line established by the legislature in the act of 1872, and it is reasonably apparent that the Dominguez heirs intended to adopt that line as the boundary between points 'B' and 'C.' This line, as has been hereinbefore declared, had been located definitely along the mark of high water. The addition of the description of a course by angles may well be rejected as being opposed to the description of a definite course well known and fixed. (Code

Civ. Proc., sec. 2077, subd. 2; *Mills* v. *Lux*, 45 Cal. 273.) However, for the purposes of a full consideration of the claim made by appellant that it holds a good prescriptive title, it may be conceded that the Dominguez heirs by their instrument of conveyance pretended to clothe their grantee with title to that property. As the argument of appellant is here understood, it is admitted that where in an instrument of conveyance or other description of real property the quantity of land to be conveyed is stated, that that term is not to be viewed as a factor in establishing boundaries, unless the more particular description expressed is indefinite and uncertain. The following descisions are in point to that effect: *Baldwin* v. *Temple*, 101 Cal. 396, [35 Pac. 1008]; *Dutra* v. *Pereira*, 135 Cal. 320, [67 Pac. 281]. It may be suggested also that the evidence does not establish that by the location of the southerly boundary line along such high-water mark the tract conveyed to Wilson et al. would have included more than two thousand four hundred acres.

"As to the line in dispute having become fixed by agreement or acquiescence at the location claimed by appellant, the facts do not bear out that contention. The ground was not improved for a long period of years by either plaintiff or his predecessors, or by appellant or its predecessors. The line could not have become fixed at a place different from that at which the record title located it, where there was no active possession on the part of claimants adverse to the record, nor any dispute or question expressed as to the true location of the line. Some testimony was given tending to show that surveyors had, in years subsequent to that during which the Terminal Land Company obtained its deed, found certain stakes, called lot and block stakes, along the straight line 'B-C.' As to when these stakes were set and by whom, the evidence did not show. Assuming that the stakes were placed there by plaintiff's predecessors in title, their location at those points would not show an abandonment of the remainder of the land conveyed to them under their deeds. There must be an agreement in order that a division line shall become fixed; this agreement must be express or implied from the acts of the parties and acquiesced in for the period fixed by the statute of limitations. (*Helm* v. *Wilson*, 76 Cal. 476, [18 Pac. 604].) There was no evidence that appellant took possession of the disputed strip of land or openly claimed that

it was entitled to it until a short time prior to the bringing
of this suit.   There was no evidence of any agreement as to
the straight line 'B-C' being adopted as the true boundary,
and no acquiescence in that line was shown, but, on the
contrary, when appellant did enter upon the strip of ground
and begin to make improvements thereon it was met by this
suit by which it was called upon to establish its legal right to
be there.

"Appellant's claim to title by adverse possession rests upon
the following facts for support: The deed from the common
grantor of both plaintiff's and appellant's predecessors de-
scribing the line 'B-C' both as a straight line (by angle de-
scription) and as being the southerly line of Wilmington; the
deed of appellant's immediate grantor following the Term-
inal Land Company's map which had been recorded and
which showed 'B-C' to be a straight line.   It was proven and
not denied that appellant had paid all taxes on the land in
dispute for more than five years prior to the commencement
of this action; also that upon a considerable portion of the
tract purported to be conveyed, not including the ground in
dispute, improvements had been made by appellant and its
predecessor.   The deeds were sufficient to give color of title.
(*Wilson* v. *Atkinson*, 77 Cal. 485, [11 Am. St. Rep. 299, 20
Pac. 66] ; *Owsley* v. *Matson*, 156 Cal. 401, [104 Pac. 983].)
It has been held that where a tract of land is claimed ad-
versely the possession that will be held sufficient is not neces-
sarily an actual possession and occupancy of the whole, but
that if some part of the tract has been subjected to the con-
tinuous possession of the claimant, this possession will extend
to the whole (*Owsley* v. *Matson*, 156 Cal. 401, [104 Pac.
983]), for the possession of one who enters under color of
title and who sets up a prescriptive claim may be in part
constructive.   Where the entry is without color of title, the
possession and occupancy must be actual as to the whole body
of the land claimed.   The underlying theory of this rule,
which is of general application, is that there must be notice
given to the legal owner as to the adverse claim; that where
color of title is held by the claimant the extent of his claim
is evidenced by the paper or judgment conferring such color-
able title, and that when possession is taken of part of the
land it will be presumed to extend to the limits of that de-
scribed in the instrument or judgment conferring the imper-

fect title. 'Where possession has been taken under color of title, the law, operating on the "color," puts the claimant in constructive possession of that part of the land called for by the "color," although it is not in his actual possession.' (1 Ruling Case Law, sec. 44.) On the other hand, when color of title is not so possessed by the claimant the real owner has no means of notice as to the extent of the adverse holder's claim, other than his acts of possession indicate; and it is said that constructively the possession of land is *prima facie* in the owner of it. Our code sections express this rule as it is generally applied. (Sections 322, 324 of the Code of Civil Procedure.) Nevertheless, in order that this rule of constructive possession shall apply in favor of the adverse claimant, it must appear that that portion of the land upon which he plants his hostile possession is a part of that claimed adversely. He cannot, under a deed which conveys a good title to a portion of a tract and a colorable one only to another portion thereof, take possession of the portion to which he has received good title and by so doing maintain the claim that constructively he is in possession of the whole of the tract. His right to the possession of property, the complete title to which he has acquired, would be no sort of notice to the true owner of the land not occupied that he claimed to be in possession of that also. The law as to this is well established: *Schmitt* v. *Traphagen,* 73 N. J. Eq. 399, [133 Am. St. Rep. 739, 69 Atl. 189]; *Turner* v. *Stephenson,* 72 Mich. 409, [2 L. R. A. 277, 40 N. W. 735.] The possession proved in favor of appellant in this case was not a possession of land subject to an adverse claim. A good title was acquired by the predecessor of appellant to a large part of the tract of land which it received from the Dominguez heirs, and it was upon such portion of the tract only that possession was established and improvements made. There was no entry upon or actual possession maintained of any part of the land in dispute until a date less than five years prior to the commencement of this action. Under the rule stated, the proof of possession was insufficient to sustain the claim of title acquired by prescription.

"The other errors assigned relate mainly to rulings of the trial judge as to the admission and rejection of evidence. These rulings, conceding error, were not such as to prejudice

the rights of appellant, in view of the conclusions expressed on the main and controlling questions of the case.''

The rehearing was ordered to again consider the provisions of section 322 of the Code of Civil Procedure. It is claimed by the appellant that the foregoing opinion is inconsistent with the rule laid down in that section.

The section defines constructive adverse possession of land where the possession is taken under color of title. It provides that where ''there has been a continued occupation and possession of the property included in such instrument, decree or judgment, or of some part of the property, under such claim, for five years, the property so included is deemed to have been held adversely,'' except where it is divided into lots and the actual possession is of only one lot. Under this provision appellant claims that where the boundaries of the junior title interfere with those of the senior title, so that part only of the area of each is common to both and is unoccupied, the junior holder who occupies a part of his land not within the interference thereby becomes an adverse occupant of the overlap, although the right of the owner of the senior title to the whole of his tract is nowhere invaded or disturbed.

We are satisfied that this construction of the section cannot be sustained. The section is a part of the chapter relative to the statute of limitations and it is intended to prescribe a rule to determine the time within which an action to recover real property, or an action arising out of the title thereto, must be begun in order to avoid the bar of sections 318 and 319 relating thereto. All of these sections must be read in connection with section 312, declaring that in order to set the various periods of limitation running there must first be a cause of action; that the period begins to run only ''after the cause of action shall have accrued.'' This is a necessary condition to the application of section 322; the occupancy must be of such a character that it would constitute a cause of action by the owner of the senior title. If the boundaries in the conflicting deeds are coterminous, the occupancy of any part of the tract by the owner of the junior title is an invasion of the right of the previous grantee and creates a cause of action in his favor. In such a case the constructive adverse possession extends to the entire tract. But if the boundaries given in the respective deeds of the two claimants are not

coterminous, but only interfere, the senior owner has no cause of action and, consequently, there is no constructive possession against him, unless some part of the land embraced in his deed is occupied by the junior holder. This propo-ition was well established at the time the code provision was adopted, and will be found declared in the following cases: *White* v. *Burnley,* 61 U. S. 251, [15 L. Ed. 886] ; *Bailey* v. *Carleton,* 12 N. H. 9, [37 Am. Dec. 140] ; *Turner* v. *Moore,* 81 Tex. 206, [16 S. W. 929] ; *Parker* v. *Rains,* 59 Tex. 18; s. c. 65 Tex. 605; *Trimble* v. *Smith,* 7 Ky. 257; *Pogue* v. *Mc-Kee,* 10 Ky. 128; *Fox* v. *Hinton,* 7 Ky. 561; *Talbot* v. *Mc-Gavock,* 9 Tenn. 275; 3 Wash. Real Prop. (6th ed.,) sec. 1984. In Sedgwick & Wait on Trial of Title, section 770, the authors say: ''An actual entry and disseisin of the true owner by the adverse claimant under a paper title is, therefore, neces-sary for the latter to acquire any constructive possession under it.'' In *Bailey* v. *Carleton,* 12 N. H. 9, [37 Am. Dec. 140], the court says that the principles upon which the rule is founded are ''that the entry and possession of the party is notice to the owner of a claim asserted to his land,'' and that if he makes no objection within the period of limitation, ''he may well be presumed to have made some grant,'' and fur-ther: ''We are of opinion that the rule cannot apply to a case where a party, having a deed which embraces land to which his grantor had good title, and other land to which he had no right, enters into and possesses that portion of the land which his grantor owned, but makes no entry into that part which he could not lawfully convey. There is no notice in such case to the owner of land thus embraced in the deed and no possession which can be deemed adverse to him'' and that in order to give the entry the character of a disseizin of the true owner, ''there must be actual possession of some portion of the land of such owner, and that of a nature to give notice of an adverse claim.'' In that case there were adjoining lots with separate descriptions. But, as the quota-tion shows, the reasoning does not proceed upon that fact as a basis. Speaking of a case of interfering boundaries the supreme court of Texas said: ''A condition precedent to the operation of the statute of limitations is possession, 'actual, visible, notorious, distinct, and hostile.' In this case, as against the true owner, no such possession was taken.'' The possession of the adverse occupant did not include any part

of the overlap. (*Turner* v. *Moore*, 81 Tex. 206, [16 S. W. 929].) The other cases cited involved interfering boundaries and in this respect were practically identical with the case at bar.

The appellant endeavors to avoid the force of these decisions by the claim that in those states adverse possession gains title only to the part actually occupied. But this is not the case. The rule regarding occupancy under color of title is substantially the same as here. The condition precedent here involved was recognized in this state in *Kimball* v. *Stormer*, 65 Cal. 120, [3 Pac. 411], where the court said: "It is apparent that, for a person to acquire a constructive adverse possession of land, he must actually oust the true owner of some part of his land." Any other rule would be in some cases productive of great injustice. One could be deprived of title to his land without ever having actual notice that his title was disputed or claimed, and with no visible invasion of his premises. The present case is a good illustration of the consequences that would ensue. The strip in dispute bounded upon tidewater. The actual occupancy mainly relied on by appellants consisted of a railroad and appurtenances situated a mile distant and across an estuary of the bay. It did not give the least indication of a claim to the land along the meander line of the estuary and on the opposite side thereof.

We conclude, therefore, that the opening clause of section 322, reading as follows: "When it appears that the occupant, or those under whom he claims, entered into possession *of the property* under claim of title," must be understood to refer to the "property" of the opposing owner, as distinguished from that described in the instrument constituting the color of title; that the "property" upon which he must enter to start his adverse claim against the true owner must be some part of the property of that owner. It is the true owner whose title is to be destroyed, and it is some part of his rightful ownership which must be invaded. Once that is done, the adverse claim extends to all of the true owner's land embraced within the junior conveyance, but until that is done, the section has no application.

The judgment and order are affirmed.

Sloss, J. Henshaw, J., Melvin, J., Lorigan, J., and Angellotti, C. J., concurred.