[Civ. No. 6037. First Appellate District, Division One.—November 25, 1927.]

PAUL AGMAR et al., Respondents, v. AARON SOLOMON et al., Appellants.

P. L. Benjamin for Appellants.

Wright, Wright & Stetson and Randell Larson for Respondents.

CAMPBELL, J., *pro tem.*—Plaintiffs brought an action in ejectment to recover possession of a lot of land having a frontage of twenty-five feet and six inches on Washington Street, San Francisco. The defendants filed an answer denying the material allegations of the complaint and by way of cross-complaint defendants Aaron Solomon and Hazel Solomon, his wife, prayed the court for a decree quieting their title to a strip of land four and one-half inches wide by 102 feet in depth, and it is the ownership of this strip of land that is in dispute. The remaining defendants have no interest in the land, being only tenants of defendants Aaron Solomon and Hazel Solomon.

It is conceded that the plaintiffs established the record title to the whole of the lot of land described in the complaint, including the land in dispute, to be in themselves, such title antedating the acquirement by Koenig—grantor of defendants Aaron Solomon and Hazel Solomon—of the land adjoining on the west the land of plaintiffs, and that such record title continued in plaintiffs up to and including the rendition of judgment herein. Koenig after acquiring title to the lot of land adjoining plaintiffs on the west, which record title did not include the strip of land in dispute, had his lot surveyed. This survey of Koenig's lot included in the survey the strip in dispute and which was a part of plaintiffs' lot, and it is conceded that this survey was incorrect in including within the boundaries of Koenig's lot such strip of land. Koenig built an apartment house according to the lines of this survey, building it upon his lot and over and upon this strip of land in dispute, which was in the possession of plaintiffs and to which they held the record title.

The judgment adjudges that "the said defendants Aaron Solomon and Hazel Solomon, and their grantees and successors, remove at once from said described piece or parcel of land (the strip in dispute) the portion of the building now situate thereon and all obstructions of any sort now situate thereon." From the judgment entered herein and from the order denying a new trial, the defendants have appealed.

Appellants urge in support of their appeal that the admissions of the answer to the cross-complaint are conclusive as to the matters thus admitted, and cannot be controverted by the evidence or the findings; that the plaintiffs by their act and conduct are estopped from claiming the possession of the land in dispute, and the court erred in awarding the plaintiffs relief by mandatory injunction.

As to the first point urged that "the admissions of the answer to the cross-complaint are conclusive as to the matters thus admitted, and cannot be controverted by the evidence or the findings," it may be said that at the trial of the case, counsel for appellants assumed that all the material allegations of the cross-complaint were denied. Not a suggestion was made in the trial court as to the allegations of the cross-complaint being admitted, and no objection was made to the introduction of evidence to controvert such allegations. This objection cannot, therefore, be urged for the first time on appeal. "This court does not look with approval upon the practice of trying a case in the lower court upon the theory that the pleadings are sufficient, and, without making any objection to them or to the evidence, raising the point here for the first time that some of the issues were, in fact, admitted. The plaintiff should not be allowed to lull the defendant into repose by introducing evidence upon each and every issue, and allowing the defendant to do the same, and then, if the verdict or decision is against him, to say for the first time in this court that some of the allegations of the complaint were not denied" (*Weidenmueller* v. *Stearns Ranchos Co.*, 128 Cal. 623, 625 [61 Pac. 374]). "It is well settled that where the parties have proceeded to trial upon a pleading without objection to its sufficiency to raise a particular issue, and evidence has been received as to the fact, and the issue found upon, the party whose duty it was to object will not

be heard in this court to say that the finding is not within the issues'' (*Illinois Trust & Savings Bank* v. *Pacific Ry. Co.*, 115 Cal. 285, 297 [47 Pac. 60]). This has been the rule in this state since the earliest cases. In *Tully* v. *Tranor*, 53 Cal. 274, we find this language: ''We have repeatedly held that when a cause has been tried in the court below upon the theory of an issue joined, a plaintiff cannot here for the first time demand judgment upon the admissions of defendant's plea.''

In contravention of the rule quoted from the foregoing cases, appellants cite a number of decisions and particularly direct our attention to *White* v. *Douglass*, 71 Cal. 119 [11 Pac. 860], *McKee* v. *Title Ins. & Trust Co.*, 159 Cal. 207 [113 Pac. 140], and *Estate of Cover*, 188 Cal. 147 [204 Pac. 583]. In *White* v. *Douglass* the court uses this language: ''Where a complaint in an action contains an allegation of fact which is distinctly and unqualifiedly admitted by the answer, there is no issue as to the fact. The allegation of the fact being admitted is conclusive. A finding against the admission is therefore outside the issues, and a judgment based upon such a finding, or upon a finding which is not justified by or is contrary to the evidence, cannot be sustained.'' In that case the cross-complaint of the defendant contains the allegation ''that pursuant to his (defendant's) application, the land-agent of the university filed in the United States land-office at Stockton, California, an application to have said land located as part of the agricultural college grant—said application being made for the use and benefit of the defendant.'' That allegation is not denied. The plaintiff answered it in the following words: ''Further answering, plaintiff admits that the land-agent, upon the application of defendant, filed in the United States land-office at Stockton, an application to have the land located as a part of the agricultural college grant, and that the application was made for the use of the defendant.'' In the present case a different situation is presented. Most of the facts alleged in the cross-complaint are controverted, leaving, however, a few alleged facts, which it is claimed are admitted by reason of a failure to specifically deny them. This failure to deny was evidently caused by oversight on the part of plaintiff's counsel, and as no objection was made and no question raised in the trial court, we con-

clude that it was likewise an oversight on the part of defendant's counsel. He evidently thought all the material allegations of the cross-complaint were denied; otherwise he would not have offered evidence to sustain such allegations. In *White* v. *Douglass, supra,* it will be noted that the allegations of fact were "distinctly and unqualifiedly admitted by the answer," and the court there says: "Where a complaint in an action contains an allegation of fact which is distinctly and unqualifiedly admitted by the answer, there is no issue of fact. The allegation of fact being admitted is conclusive, . . . and a judgment based upon such a finding or upon a finding which is not justified by or is contrary to the evidence, cannot be sustained." To the same effect is *McKee* v. *Title Ins. etc. Co.,* cited. There the complaint avers that the hotel company is and has been ever since April 12, 1906, a corporation, existing under the laws of Arizona, which allegation is admitted by the answer. In view of this direct admission the court, as it did in *White* v. *Douglass, supra,* says: "This is a conclusive admission, not to be controverted either by the evidence or the findings." Appellants in their brief quote the following from *Estate of Cover, supra:* "It is the rule that an admitted fact must be treated as 'found,' and, if the court in this case has found adversely to the admitted fact that the deceased left estate in Los Angeles county, we should be compelled to ignore such finding on this appeal." In that case the allegation that the deceased left estate in Los Angeles County is distinctly and unqualifiedly admitted, as was the case in *White* v. *Douglass,* from which we have quoted.

The cases cited by appellants are not, in our opinion, in conflict with the rule laid down in *Weidenmueller* v. *Stearns, supra,* that a party to an action should not be allowed to lull the adverse party into repose by introducing evidence upon issues not denied and allowing the opposing party to do the same, and if the verdict or decision is against him, to say for the first time on appeal (as in the case here) that some of the allegations of the cross-complaint were not denied.

There is no merit in appellants' second point that "the plaintiffs by their acts and conduct are estopped from claiming the land in dispute." The trial court found "that said Koenig was not caused to construct the said apartment

house in the manner or place in which the same had been constructed as stated in the cross-complaint or to construct said fence as therein stated by reason of the act or acts or conduct of plaintiffs as alleged in the cross-complaint,'' and there being sufficient evidence in the record to support such findings, the finding will not be disturbed on appeal.

The facts are briefly these: Koenig first talked to the senior Agmar in the latter's home. Agmar, a man of eighty-seven years of age, was at the time sick. Koenig informed Agmar that he had purchased the property adjoining his property, had had it surveyed, and was going to erect a building. Koenig testified as to his conversation with Agmar: ''I said: 'The survey shows it is clear, it is almost clear, the survey, well it shows $\frac{1}{8}$ or $\frac{1}{4}$ of an inch, some sort, from Mr. Agmar's residence—and then, I guess that is all he received as to that.'' Nothing was said about the rain gutter until Koenig's building had been erected to the point where the rain gutter on the Agmar house stood in the way. Koenig also admitted that he said nothing about the fence in his conversation with Agmar. Koenig ''believed'' he showed Agmar his survey, but was not sure when he did so, while Agmar stated he did not see it. Not a thing was said about surveyor's stakes or marks. Then Koenig began to excavate for his building. It also appears from the record that Koenig moved a division fence to the line shown by this incorrect survey.

The following is the testimony to which appellants have directed our attention as establishing their contention that plaintiffs are estopped from claiming possession of the strip of land in dispute.

Charles J. U. Koenig, who constructed the apartment house, testified that while he was engaged in excavating his lot, he spoke to the plaintiffs about the necessity of deepening the foundation of the Agmar residence, and that as soon as plaintiffs deepened their foundation, he put in the foundation of the apartment house and built it close up against the foundation of the Agmar house, the Koenig foundation extending from the front of the Koenig lot a distance of eighty feet toward the rear of such lot, and that, during the entire time that he was engaged in the construction of the apartment house, none of the plaintiffs ever made any suggestion to him that he was building on the

Agmar lot, and that he believed during all of such time that he was building the apartment house on his own lot.

Paul Agmar, one of the plaintiffs, and the father of the other plaintiffs, testified that he lived in the Agmar residence and had lived there continuously from 1912; that from the time of the acquirement of the Agmar property by the plaintiffs he had had the management of the property entirely in his own hands; that he bought the Agmar property in 1890, and that before he bought the property he had had a survey made of the property, and that he had retained the map of such survey ever since, and he produced the map in court. The map very plainly shows plaintiffs' lot to be twenty-five feet and six inches in frontage and to include the strip of land in dispute in this action. The witness further testified that when Koenig built the apartment house, he built it right up close against the Agmar residence and that the apartment house is still in such position. The witness further testified that before Koenig started any work whatever on the Koenig lot, Koenig called on the witness and told him that he, Koenig, was going to build an apartment house on the adjoining Koenig lot and that he had had a survey made of the Koenig lot and that, according to such survey, the Agmar residence was over on the Koenig lot. The witness stated nothing to Koenig as to where the line of the Agmar property ran. Before such conversation the witness had believed that the Agmar residence was entirely on the Agmar lot and fully four inches from the boundary line between the two lots. Subsequently and before Koenig began any work on his lot Koenig told the witness that he was going to grade the Koenig lot, and that it would be necessary for the witness to build the foundation of the Agmar house farther down than it then was. Later Koenig graded the Koenig lot, but left four inches of soil adjoining the Agmar foundation undisturbed so as to protect the Agmar foundation. Subsequently Koenig sent a building inspector to the Agmar house, who notified the witness that he must deepen the Agmar foundation so as to protect the Agmar building. The son of the witness then sought to have Koenig do the work of deepening the foundation of the Agmar house, offering to pay Koenig for doing the work, but Koenig declined to do the work.

Paul Harold Agmar, one of the plaintiffs, and a son of the plaintiff Paul Agmar, testified that his father had always had the management of the Agmar property; that Koenig built the apartment house right up against the Agmar residence, and left no space whatever between the two buildings; that while Koenig was excavating the Koenig lot he spoke to the witness in the presence of the latter's father about the necessity of the father deepening the foundation of the Agmar house and told the witness that he, Koenig, could not go any further with the work on the Koenig lot until the Agmar foundation was deepened, and the witness then stated that he would take care of the Agmar foundation. Accordingly the foundation of the Agmar building was deepened before Koenig started work on putting in of the foundation of the apartment house. As soon as the work on the Agmar foundation was completed, Koenig started to build the foundation for the apartment house. The construction of the apartment house took several months, and during that time the witness lived in the Agmar house and observed the work of construction.

Albert R. Agmar, likewise a plaintiff and a son of the plaintiff Paul Agmar, testified that his father had always had the management of the Agmar property, and that while he, the witness, lived in the Agmar residence during the time Koenig was constructing the apartment house he never spoke to Koenig except to say, ''How do you do.''

These facts do not call for the application of the general rule of estoppel (*Biddle Boggs* v. *Merced Min. Co.*, 14 Cal. 279; *Lux* v. *Haggin*, 69 Cal. 255 [4 Pac. 919, 10 Pac. 674]). Appellants have cited us to *Dolbeer* v. *Livingston*, 100 Cal. 621 [35 Pac. 328], and *Cummings* v. *Kearney*, 141 Cal. 160 [74 Pac. 759], as authority for their contention that the general principles of estoppel are applicable to this case. The rule announced in the Dolbeer case is ''that where a person by words or conduct induces another to act on belief in the existence of a certain state of facts he will be estopped as against him to allege a different state of facts. . . . Estoppel *in pais* may be defined to be a right arising from acts, admissions or conduct which have induced a change of position in accordance with the real or apparent intention of the party against whom they are alleged. . . . Where a party tacitly encourages an act to

be done he cannot afterwards exercise his legal right in opposition to such consent," and the Cummings case, while the court holds, "Where a man has been silent, when in conscience he ought to have spoken, he will not be allowed to speak when conscience requires him to be silent," it also says that "his silence was not the only culpable thing, but the direct acts and requests evidenced by the writings herein set forth," and that "his acts and conduct, if allowed now to be questioned, would work a fraud upon the owner of the bond."

In the present case Koenig was not induced by the acts, admissions, or conduct of respondents to construct the apartment house so that the east wall rests upon the four and one-half inches of land in dispute and which in fact belongs to respondents, but it was placed there by Koenig through a mistake made by the surveyor employed by him, nor was Koenig misled by the silence of respondents. It was not respondents' silence, but the mistake in the survey, and which mistake cannot be charged to respondents, that controlled Koenig's action.

Appellants contend that the rule of law as laid down in *Loustalot* v. *McKeel*, 157 Cal. 634, 640 [108 Pac. 707], and a number of other cases cited by them to the same effect is applicable to this case. That rule is stated as follows: "Where the boundary line between the lands of contiguous owners is doubtful or uncertain, and they by parol agreement fix and determine a dividing line between their respective tracts, said line being marked by the erection or maintenance of a fence or other equivalent structure along it, and thereafter the parties hold and occupy their respective lands to the boundary so agreed on, the accuracy of such boundary line cannot be subsequently questioned by the parties establishing it, or by those claiming under either of them."

Here it is not claimed nor does the evidence admit of the claim that the false line established by Koenig, the grantor of appellants Aaron Solomon and Hazel Solomon, was acquiesced in for a period equal to the statutory period of limitations, it being contended that the boundary line shown by the incorrect survey made for Koenig was agreed to. Even the testimony summarized by appellants and upon

which they base their claim does not establish an agreed boundary line.

TLe court found the following facts which find support in the evidence: That plaintiffs did not nor did either of them at any time state or agree with Koenig that the survey of Koenig's lot of land was true and correct or truly or exactly stated the exact location of the easterly boundary line of Koenig's land, or that the rain gutter encroached upon Koenig's land for a distance of four and three-quarters inches or any distance; that plaintiffs did not, nor did either of them, agree with Koenig to remove any rain gutter, or that any fence should be set back into plaintiffs' land for a distance of four and one-half inches or for any distance, or that Koenig might or should erect said apartment house so that the easterly side thereof be built up to the boundary line as shown by said survey; that plaintiffs did not, nor did either of them, ever acquiesce in the truth or correctness of said survey or enter into any agreement that said survey truly or correctly stated the location of the dividing line, or that Koenig might build the said apartment house up to said easterly line of said Koenig's lot as shown by said survey; that the construction of said apartment house was not commenced with the consent of plaintiffs or either of them, or was not continuously proceeded with until its completion with their, or either of their, consent, and that said fence was not moved from its former location with the consent of plaintiffs or either of them.

The recent case of *Wilder* v. *Nicholaus,* 50 Cal. App. 776 [195 Pac. 1068], holds that the construction of a fence between adjoining land owners and acquiescence in its existence for many years does not establish the true boundary line in the absence of an agreement that the fence was on the true line. The court, quoting from *Grants Pass Land & Water Co.* v. *Brown,* 168 Cal. 456 [143 Pac. 754], says: "When such owners, being *uncertain* of the true position of the boundary as described, *agree* upon the true location, mark it upon the ground, or build up to it, occupy on each side up to the place thus fixed and acquiesce in such location for a period equal to the statute of limitations, or under such circumstances that substantial loss would be caused by a change of its position, such line becomes, in law, the true line. . . . And if the line is located and

agreed to, not for the purpose of settling an uncertainty in the minds of the parties as to the position of the true line upon the ground . . . or *without the intent* to fix the true line, such agreement is invalid and does not change the legal boundary nor affect the title of either party to the land he previously owned." (See, also, *Clapp* v. *Churchill,* 164 Cal. 741, 745 [130 Pac. 1061]; *Wheatley* v. *San Pedro etc. R. R. Co.,* 169 Cal. 505, 514 [147 Pac. 135].) This doctrine can only be invoked where adjoining owners, being uncertain of the actual position of the boundary, agree upon its true location. The validity of such agreement rests upon the belief and understanding of both parties that they are establishing the true dividing line (*Friedman* v. *Southern Cal. Trust Co.,* 179 Cal. 266 [176 Pac. 442]). The proof of such agreed location should be clear (*Marcone* v. *Dowell,* 178 Cal. 396, 405 [173 Pac. 465]). ▮ The mere acquiescence in the existence of the fence or other improvement and the occupancy of the land would not amount to an agreement that such fence or improvement was on an accepted boundary line (*Staniford* v. *Trombly,* 181 Cal. 372, 375 [186 Pac. 599]). "Where there is an acquiescence in a wrong boundary, when the true boundary may be ascertained by the deed, it is treated, both in law and equity, as a *mistake,* and neither party is estopped from claiming to the true line. The boundary is considered definite and certain when by survey it can be made certain from the deed" (*Janke* v. *McMahon,* 21 Cal. App. 781, 788 [133 Pac. 21]).

▮ The final objection that the court erred in awarding plaintiffs relief by mandatory injunction presents the most serious question. The authorities upon this point are collected in the notes under *Pradelt* v. *Lewis,* 297 Ill. 374 [14 A. L. R. 828, 130 N. E. 785], in which case the supreme court of Illinois holds: "A mandatory injunction will ordinarily issue against the maintenance by a landowner of an encroachment on the land of an adjoining owner to compel the removal of such encroachment (1 R. C. L. 378). The doctrine thus laid down by this authority finds support in the decision (citing authorities). It is true, as argued by counsel for appellants, that the courts have held that where the encroachment is slight and the cost of removing it will be great and the corresponding benefit to

the adjoining owner small, or compensation and damages can be had, the court will ordinarily decline to compel a removal, and will leave the complaining party to his remedy at law (1 C. J. 1209). This last rule is sometimes stated as applying only when the encroachment is slight and unintentional. In such cases the owner will ordinarily be left to his legal remedy, and the extraordinary remedy by injunction will be allowable only when strong reasons therefor are shown; but if the encroachment was intentional, the absence of present damage to the owner of land encroached on will not defeat his right to an injunction." While there is some authority to the contrary, the rule stated is generally supported by the decisions and is, we think, the correct rule.

In *Blake* v. *McCarthy,* 115 N. Y. Supp. 1014, 1015, the court in discussing the question uses this language: "Plaintiff is entitled to the removal of this encroachment. It cannot be removed by execution, because of the damage to remainder of defendant's property. By taking down the wall, it would impose a risk of damage upon the sheriff which he is not bound to incur in an execution. Plaintiff is entitled in a single action to both legal and equitable relief in a case like this. He had enforced his legal right. The jury rendered their verdict for him. He is now seeking his equitable remedy by asking the interposition of the court to remove the encroachment. To this he is entitled."

Our attention has been called to but two California cases bearing upon this question. Respondents cite us to *Felsenthal* v. *Warring,* 40 Cal. App. 119, 129 [180 Pac. 67], and the appellants cite *Rothaermel* v. *Amerige,* 55 Cal. App. 273 [203 Pac. 833]. In the Felsenthal case the court says: "To justify the issuance of an injunction there must be substantial *injury.* Substantial 'injury,' however, does not necessarily involve substantial 'damage.' . . . The rule that a chancellor will refuse to enjoin when greater injury will result from granting than from refusing an injunction has no application where the act complained of is in itself as well as in its incidents tortious. In such case it cannot be said that injury will result from an injunction, for no man can be heard to say that he is injured by being prevented from doing to the hurt of another that which he has no right to do. When a suitor has brought his case clearly

within the rules of equity jurisprudence, the relief he asks is demandable *ex debito justitiae,* and needs not to be implored *ex gratia.* There can be no balancing of convenience when such balancing involves the preservation of an established right which will be extinguished if the relief be not granted against one who would destroy it—yea, though the right be but that of a peasant to but a part of his small tenement (citing cases). . . . The obvious distinction between *injury* and *damage*—a distinction not always observed when dealing with the question before us—is emphasized by Mr. Wood, who, speaking of a man's right of dominion over his property and the jealous care with which the courts have ever guarded this sacred right says: 'Whatever invades this right is a *legal* injury, whether damages ensue or not' (Wood on Nuisances, sec. 783—see, also, secs. 376, 782). As is said in *Learnard* v. *Castle,* 78 Cal. 454 [18 Pac. 872, 21 Pac. 11], *supra,* speaking of an injury to another's land that is a nuisance *per se:* 'It is an injury to the *right,* and it cannot be continued because other persons (whether jurors or not) might have a low estimate of the damages which it causes. And especially is this so when the continuance of the wrongful act might ripen into a right in the nature of an easement or servitude. . . . The right to an injunction, therefore, in such a case does not depend upon the extent of the damage measured by a money standard—the maxim *de minimis etc.* does not apply.' Though dissenting from the majority decision in *Sullivan* v. *Jones & L. Steel Co.,* 208 Pa. 540 [66 L. R. A. 712, 57 Atl. 1065], *supra,* Justice Mitchell was constrained to say that 'Where a clear legal right is being infringed, I agree that the remedy in equity is as mandatory as in law.' ''

The Rothaermel case, cited by appellants, is distinguishable from the present case. There plaintiffs' predecessor brought ejectment and obtained nominal damages in the sum of one dollar, and directing the issuance of a writ of assistance without further proceedings. Thereupon plaintiffs came into the ownership of the property and brought an action for a mandatory injunction, pleading the former judgment as establishing the right of ownership in possession in plaintiffs' predecessor and praying that a mandatory injunction issue compelling defendant to remove a concrete foundation ex-

tending an inch and one-half on plaintiffs' land and also to remove a brick wall situated thereon, which, however, did not extend over and upon plaintiffs' land. The appellate court denied the remedy sought, holding it was a case where there was a bare legal right unsupported by any damage shown in which the plaintiff was without right to claim equitable relief. Here the circumstances are different. Defendants invoked the equity jurisdiction of the court through the allegations of their cross-complaint. The trial judge, sitting as a chancellor, found against their contentions and granted equitable relief to plaintiffs. The court was not passing upon a "bare legal right," but was determining the rights of the parties upon equitable principles. It would be a strange interpretation of the law that would permit one party to an action to beseech equity, and when the court found his prayer for equitable relief unwarranted, to deny that court the application of equitable principles to the other party to the action. The appellants' having asked equity cannot complain of equity merely because the court found the equities to be against them.

In determining the relief to be granted the court had a clear understanding of the relative merits of the claims put forth by the respective parties. Koenig purchased the property adjoining that of respondents. His own survey showed that there was a space of but three-quarters of an inch between his line and the wall of the Agmar house. A cursory inspection would have shown him that the rain gutter of the Agmar house extended over his line about four inches. If he noticed this—and he probably did—he remained silent. This rain gutter standing out beyond the line shown on his own survey was an open and notorious notice to him and to all the world that the Agmars were claiming title beyond the line claimed by him. According to his own testimony Koenig told Agmar that the Agmar house was "clear" of his line. Koenig erected his building up against the Agmar house in disregard of the space shown by his own survey. He ignored the fact that the rain gutter of the Agmar house extended out beyond the line of his survey. Koenig was the aggressor. Agmar was not asked to agree to anything or to acquiesce in anything. As to the expense of moving appellants' building the court had before it Koenig's own estimate of

the cost, which was given as fifteen hundred dollars to two thousand dollars. But as the encroachment was intentional and was not the result of accident or innocent mistake, the cost of removing it or the absence of damage to the owner of the land encroached on will not defeat the right of such owner to a mandatory injunction (*Pradelt* v. *Lewis, supra*).

In the recent case of *Owenson* v. *Bradley,* 50 N. D. 741 [31 A. L. R. 1296, 197 N. W. 885], decided by the supreme court of North Dakota, the law on mandatory injunctions is discussed at some length. In that case a mandatory injunction was denied, but the reason for such denial was clearly stated and the power of courts to grant such relief definitely announced. There the relief was denied because of the fact that defendant in placing a concrete foundation and brick wall forming a part of a building sixteen and three quarters inches wide at one end and three inches wide at the other on plaintiff's lot, which was vacant and likely to remain so for a long period of time, was so placed through an innocent mistake. The authorities collected in the Owenson case, where mandatory injunction was denied, all turn on the fact of an innocent mistake, but the rule is otherwise where the encroachment is not due to accident or innocent mistake. In the present case the court may well have concluded, and the granting of injunctive relief evidences that it did conclude, that the encroachment upon the land of respondents was not the result of accident or mistake, but was placed there with knowledge of respondent's claim of ownership—that Koenig had actual knowledge of such claim, or if he did not have actual knowledge, by the exercise of ordinary diligence he would have acquired such knowledge.

We think that under the facts and circumstances here presented the judgment entered was proper.

The judgment and order are affirmed.

Tyler, P. J., and Cashin, J., concurred.

A petition by appellants to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on January 23, 1928.

All the Justices concurred.